270 N.J. Super. 550 (1993)
637 A.2d 593
STATE OF NEW JERSEY, PLAINTIFF,
v.
CHARLES PATTERSON AND RONALD JOHNSON, DEFENDANTS.
Superior Court of New Jersey, Law Division (Criminal), Monmouth County.
Decided January 22, 1993.
*552 Elaine Leschot, Assistant Prosecutor, for the State (John Kaye, Monmouth County Prosecutor, attorney).
R. Diane Aifer, Deputy Public Defender for defendant Patterson.
David P. Donnelly, Assistant Deputy Public Defender, for defendant Johnson (Zulima V. Farber, Public Defender, Attorney).
O'HAGAN, J.S.C.
The defendants, Charles Patterson and Ronald Johnson, have filed motions to suppress evidence of controlled dangerous substances found by the Red Bank Police Department on their persons and within their possession on February 14, 1992. This court, after a hearing, grants the defendants' motion.

I. Facts
In its barest form, the evidence reveals that two young men hired a taxi cab to drive them from the Red Bank train station to Asbury Park. Sergent Joseph Hoffman of the Red Bank Police Department, directed Patrolman Elliot Ramos, who was driving a marked car in the area, to effect a stop of the cab. Subsequent to the radio transmission by Hoffman, Ramos observed the two passengers in cab # 433 of the Yellow Cab Company look back at him and then turn around and move towards each other, bending their heads down. Once the taxi cab was pulled over, the actions of the two defendants gave a legal basis for the police to effect a *553 search which subsequently revealed enough controlled dangerous substances to support second degree drug charges against each.
The threshold issue that will be resolved is whether a sufficient legal basis existed to stop the taxi cab. In this regard, Hoffman, over the course of three years, developed a profile associated with typical drug dealers utilizing the Red Bank train station to transport controlled dangerous substances. Based on this profile, defendants' vehicle was stopped. An ancillary issue is whether the movement observed by Ramos, coupled with the drug profile developed by Hoffman, elevated police suspicion to a level sufficient to provide a legal basis for the traffic stop.

II. The Profile
Hoffman, of the Red Bank Police Department, testified in a most credible fashion that the Red Bank Police Department, in cooperation with other law enforcement agencies in the Shore area, have reasonably concluded that drug dealers extensively use mass transit in their drug distribution schemes. In this respect he established that narcotics or illegal controlled dangerous substances are available to dealers in fairly large quantities if purchased in New York City. After such purchase, the drugs are distributed in the Monmouth County area at significant profit. Thus, drug dealers or their runners will journey to New York City to buy drugs and then travel back to Monmouth County to sell them. Mass transit is used in this operation, first of all because such transportation goes directly to New York City. Second, the persons involved do not risk forfeiture of their cars if stopped and charged by the police. See, Forfeiture, N.J.S.A. 2C:64-1 to -9. Third, the actors in this trade apparently believe that the police in the municipalities where they sell drugs are familiar with their cars; thus, the participants conclude that there is an increased likelihood of apprehension and arrest by the police if they use private passenger vehicles. Fourth, frequently, large numbers of participants are involved in this pattern, which thereby makes the use of private passenger vehicles more difficult. The Red Bank Police Department, along with police officers in other shore towns *554 through which the trains and New York buses pass, have become familiar with this practice of using mass transit to transport drugs to their ultimate destinations in Monmouth County.
The police, using appropriate investigative techniques, have gathered this information by means of questioning those involved in the illicit drug trade and by surveillance operations conducted at the train stations in Red Bank, Long Branch and Asbury Park. Based upon this information, the police in the towns involved began patrolling the train stations observing, on a frequent basis, resident drug dealers exit from the southbound trains, ultimately to sell their drugs in the community. Many of the participants were known to the police as drug dealers or perhaps drug runners. Knowledge of the distribution practice of drug dealers and familiarity with the dealers themselves led to frequent arrests.
In turn, the participants thereafter adjusted their plans by disembarking from the train in municipalities other than their place of residence and ultimate point of distribution. For instance, drug dealers residing in Asbury Park or Long Branch frequently got off the train in Red Bank and took a taxi cab to their ultimate place of distribution, notwithstanding the fact that if they remained on the train south of Red Bank it would stop at both Long Branch and Asbury Park. Inquiries by the police revealed that the cost of the cab fare to Asbury Park from Red Bank is many, many times the expense of traveling the same distance on the train. These conclusions on the part of the Red Bank police as to the pattern of conduct were confirmed by subsequent apprehension of drug dealers at the Red Bank train station and from the resulting questioning of the subjects in the arrest procedure. In addition, the police also relied upon information provided by confidential informants.
When this information was synthesized, a profile of the typical or prototype drug dealers or runners was developed as follows: they are young black males travelling together who exit from the southbound train at Red Bank and who frequently wear warm-up suits with starter jackets. Such individuals would exit the train and make noticeable efforts to avoid detection and then proceed *555 directly to nearby taxi cab stations, seeking a ride to Asbury Park or Long Branch. To confirm these suspicions Hoffman spoke with a cab driver and another representative of the Yellow Cab Company who confirmed the information the police had gathered. Hoffman was advised that most, if not all, of the individuals fitting the above noted profile who walked up to the taxi cab from the train station and requested a ride to Asbury Park or Long Branch were involved in narcotics trafficking. The cab company representatives related that frequently they saw cocaine, marijuana or drug paraphernalia in possession of their passengers. Moreover, on frequent occasions, the individuals involved discussed between themselves what they were doing and sometimes bragged about the controlled dangerous substances they were transporting.
Hoffman, on February 14, 1992, had a radio scanner in his unmarked squad car which allowed him to monitor the radio transmissions of the Yellow Cab Company. Thus, when he was half a block from the train station, at a time when a train was in the station, he heard the driver of cab # 433 state he had a walk-up fare that he would transport to Asbury Park. Hoffman did not see if the defendants had exited a train or whether the defendants had come from elsewhere. It follows that he also did not see defendants' conduct prior to entering the vehicle. The first contact Hoffman had with the defendants was when cab # 433 drove past him. The officer noted its passengers were two young black males who had entered a cab bound for Asbury Park from the Red Bank train station. Hoffman noticed no unusual behavior of the passengers when he drove past. This passing on the roadway was Hoffman's only observation of the defendants Johnson and Patterson before the stop was effected by Ramos several blocks later. Prior to the point of the stop, Ramos did observe "furtive movements" in the taxi cab, but this was subsequent to Hoffman's directive to stop the cab.

III. Justification for the Stop: Profile
It is now well established that the police cannot randomly stop a vehicle on the highways of our State. Delaware v. Prouse, *556 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660, 673 (1979); State v. Carpentieri, 82 N.J. 546, 414 A.2d 966 (1980). Except when stops are conducted in certain limited circumstances and under well defined guidelines, such traffic stops are violative of privacy interests which are protected under the Fourth Amendment. State v. Kirk, 202 N.J. Super. 28, 493 A.2d 1271 (App.Div. 1985). It follows that in such instances the evidence obtained as a consequence of the traffic stop may suppressed by the court upon appropriate motion. R. 3:5-7.
On the other hand, the police have the responsibility and duty to investigate suspicious behavior. State v. Davis, 104 N.J. 490, 503, 517 A.2d 859 (1986). Clearly, society demands that reasonable and appropriate actions be taken to protect our citizens and to rid our streets of illicit drugs. Appropriate steps must be taken so the criminal element cannot run roughshod over society at large.
To insure that citizens are safe and protected from the criminal element, our society requires that, in certain circumstances, the police may stop and question those suspected of criminal wrongdoing. Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906 (1968); State v. Davis, supra, 104 N.J. at 490, 517 A.2d 859. To balance the competing interest of the individual against the needs of society, courts have established criteria which, when met, allow the police to stop and question those suspected of wrong-doing. Ibid. The standard for whether an investigatory stop is proper is whether the police had "articulable reasons" or a "particularized suspicion" of criminal activity. Id. at 504, 517 A.2d 859. When an automobile is involved, a valid stop can be effected if the police have a "`reasonable suspicion' that the occupants are engaged in unlawful activity." State v. Barcia, 235 N.J. Super. 311, 317, 562 A.2d 246 (App.Div. 1989) (citing Delaware v. Prouse, supra, 440 U.S. at 663, 99 S.Ct. at 1401; United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); State v. Egan, 213 N.J. Super. 133, 135, 516 A.2d 1115 (App.Div. 1986)).

*557 A. The Profile: Circumstances

In articulating the facts that give rise to reasonable suspicions, the police may rely not only upon observed facts, but also upon reasonable inferences drawn from specific articulable facts. United States v. Cortez, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). The Supreme Court has recognized that the officer's observations are to be weighed in terms of the standards of those "versed in the field of law enforcement." State v. Davis, supra, 104 N.J. at 501, 517 A.2d 859 (quoting U.S. v. Cortez, supra, 449 U.S. at 418, 101 S.Ct. at 695, 66 L.Ed.2d at 629). Therefore, a trained police officer may properly draw inferences and make deductions which might easily elude an untrained person. Ibid. (citing U.S. v. Cortez, supra, 449 U.S. at 418, 101 S.Ct. at 695, 66 L.Ed.2d at 629). Common sense dictates, therefore, that the reviewing court must acknowledge and give appropriate consideration to the officer's experience as well as his or her assessment of the underlying factual pattern and deductions which may be drawn therefrom. See, Terry v. Ohio, supra, 392 U.S. at 20, 88 S.Ct. at 1879, 20 L.Ed.2d at 905; State v. Davis, supra, 104 N.J. at 505-07, 517 A.2d 859.
In this respect the police may rely upon the totality of the circumstances in concluding that a reasonably objective basis exists to suspect an individual of wrongdoing; police are required to look at the "whole picture." State v. Davis, supra, 104 N.J. at 500-01, 517 A.2d 859 (quoting United States v. Cortez, supra, 449 U.S. at 417-18, 101 S.Ct. at 694-95, 66 L.Ed.2d at 628-29). Therefore, provided that suspicions which are directed at specific individuals arise, the police may develop and rely upon a so-called "profile." See, Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); Reid v. Georgia, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980). In appropriate factual circumstances, the police may piece together a series of acts, which by themselves seem innocent, but to a trained officer reasonably indicate that wrongdoing is underway. U.S. v. Sokolow, 490 U.S. 1, 109 S.Ct. *558 1581, 104 L.Ed.2d 1 (1989). In developing the "profile," police may rely upon intelligence they have gathered in past similar circumstances. See e.g., U.S. v. Sokolow, supra, 490 U.S. at 1, 109 S.Ct. at 1581, 104 L.Ed.2d at 1; Florida v. Royer, supra, 460 U.S. at 491, 103 S.Ct. at 1319, 75 L.Ed.2d at 229. Therefore, when a sufficient data base is developed, the police may conclude that crimes are being repetitively committed which share certain essential facts or means.
For example, Hoffman's compilation of data demonstrates that the use of mass transit to transport drugs from a distribution center in New York City and northern New Jersey to shore communities is a prevalent, repetitive pattern. Another example of the pattern is the use of youthful runners who personally transported the drugs on behalf of drug dealers who mastermind a drug distribution system in the Monmouth County area. It is appropriate and legitimate police work to develop a so-called "profile" based upon observations made in investigating the distribution or transportation of illicit drugs. U.S. v. Sokolow, supra, 490 U.S. at 1, 109 S.Ct. at 1581, 104 L.Ed.2d at 1. Certainly the police may rely upon intelligence gathered from interrogation of those suspected or charged with drug offenses and upon discussions and investigations of persons involved in the periphery of such a distribution operation, i.e., a cab driver. Using these and other means, the police can develop a pattern of criminal wrongdoing which justifies their suspicion when they observe features that are in accord with the principal aspects of that pattern. Ibid. However, a reasonable suspicion to justify a stop and subsequent questioning of a suspect could not arise solely on the basis of conclusions that do not fairly result form a individual's actions and conduct. State v. Davis, supra, 104 N.J. at 501, 517 A.2d 859 (citing U.S. v. Cortez, supra, 449 U.S. at 418, 101 S.Ct. at 695, 66 L.Ed.2d at 629).

B. The Profile: Race
Initially, the profile which Hoffman developed, which identifies black males as part of the profile, is obviously based on race *559 and not on conduct. The police are not permitted to draw any inferences from a suspect's race. State v. Kuhn, 213 N.J. Super. 275, 517 A.2d 162 (App.Div. 1986). Certainly the police cannot conclude that all young, male African-Americans are suspected of involvement in the illicit drug trade. Therefore, an individual's race cannot be considered at all when conclusions are reached or assumed as to a "profile" suggesting criminal activity. Ibid. Yet, the race of the two defendants here played a large role in the stop of cab # 433 in Red Bank. From the hearing, it clearly and convincingly appeared that Hoffman is not a racist. Rather, he established through direct and cross examination that his analysis was based on what he believed to be a pragmatic, empirical study as well as discussions with officers in towns abutting the railroad. Nonetheless, the race of the defendants was a principal feature leading to their subsequent arrest. As a matter of law and fairness, the race of the suspects in the circumstances of this case can play no part. State v. Kuhn, supra, 213 N.J. Super. at 282, 517 A.2d 162.

C. The Profile: Age
The relative youth of the defendants and their attire in athletic clothing are circumstances that might be considered in an appropriate case as a component part of the factual pattern establishing a profile. However, appearance taken alone is insufficient to justify a stop. There must be more, i.e., some conduct on the part of the defendants reasonably leading to the conclusion that seemingly innocent acts, when considered in their totality, evidence criminal wrongdoing. U.S. v. Sokolow, supra, 490 U.S. at 1, 109 S.Ct. at 1581, 104 L.Ed.2d at 1.

D. The Profile: Taxi Cab Hiring
The State points to the fact that the defendants hired a taxi cab to drive them to Asbury Park and suggests this action was designed to minimize the chance for apprehension when the defendants arrived in Asbury Park. Surely, in an appropriate *560 case, this pattern of behavior might be an appropriate component link establishing criminal activity. Here, however, the Sergeant only inferred that the defendants had journeyed from New York on the train and exited therefrom in Red Bank. Hoffman was on route to the railroad station at a point when the train had already arrived and his first observation of the defendants was in the taxi cab. No one could establish that the two defendants actually got off the train in Red Bank, nor could anyone describe their conduct as they approached the taxi cab.
Clearly, had the defendants' conduct or demeanor in that time period been observed, it would be helpful in suggesting or dispelling whether they were involved in criminal activity. Obviously there are innocent explanations that might justify the defendants' hiring of a taxi cab. In the absence of observing their exit from a train originating from the New York area, or observing their demeanor and conduct as they made their way to the taxi cab, the police may not appropriately conclude that these two young men matched the drug profile earlier described. If their actions while on route to the cab had heightened reasonable suspicions of wrongdoing, the police, in that circumstance, might place considerable and appropriate weight to the hiring of a taxi cab to travel to Asbury Park when the train, at a cheaper cost, would have ultimately stopped in Asbury Park. Clearly, in some cases, the incurring of this significant added expense, given the police intelligence, would serve to reasonably heighten suspicions. While the representatives of the taxi cab company might have considered that most, if not all, young black men journeying to Asbury Park from the Red Bank Railroad Station were involved in the drug trade, the police cannot base a stop in these conclusions on the factual pattern of this case. See, State v. Kuhn, supra, 213 N.J. Super. at 282, 517 A.2d 162.

IV. Justification for the Stop: Furtive Movements
The court concludes that the so-called furtive movements of the defendants in the taxi cab did not cause a reasonable suspicion to arise that they were involved in criminal activity. Ramos, *561 before effectuating the stop, observed certain movements of the defendants after they were aware of his presence. It is significant, however, that these observations were not made known to Hoffman until his arrival at the scene, subsequent to the stop. Furthermore, Ramos had been directed to make a stop of the cab before he made any independent observations. Ramos was also not intimately familiar with the various facets of the profile developed by Hoffman and was unaware of any specific actions taken by these defendants. He knew that his superior officer had directed him to stop cab # 433, but he knew little or nothing of the underlying factual profile referenced earlier. It is true that a combination of the profile and the furtive movements might provide a reasonable basis for a stop. Here, however, since one person had primary knowledge of the profile and another had exclusive knowledge of the movements of defendants, these separate observations cannot be subsequently combined to justify the stop. See State v. Bruzzese, 94 N.J. 210, 221, 463 A.2d 320 (1983) (facts learned by the arresting officer subsequent to the search and seizure would not post facto validate unreasonable intrusions).
It is settled that mere nervous and furtive gestures are insufficient, standing alone, to rise to the level of an articulable suspicion. State v. Lund, 119 N.J. 35, 47, 573 A.2d 1376 (1990). Our Supreme Court has adopted the view that it is not uncommon for people to appear nervous or excited when a police officer is approaching. Ibid. The Lund court found that nervous movements do not necessarily suggest criminal activity, but rather, merely that the presence of police officers "tends to make most people somewhat apprehensive." Ibid. (citing State v. Palacio, 111 N.J. 543, 558, 545 A.2d 764 (1988) (Stein, J., dissenting)). Accordingly, Ramos's observations alone are insufficient to justify a stop of defendants.

V. Conclusion
The observable facts in this case did not justify the stop of cab # 433 in Red Bank; therefore, defendants' motion to suppress the evidence is granted.