742 A.2d 154 (1999)
326 N.J. Super. 528
STATE of New Jersey, Plaintiff-Appellant,
v.
Milton CONTRERAS and Mark Diaz, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued September 29, 1999.
Decided December 16, 1999.
*156 Gary A. Thomas, Assistant Prosecutor, for plaintiff-appellant (Donald C. Campolo, Acting Essex County Prosecutor, attorney for appellant; Mr. Thomas, of counsel and on the brief).
Alison Perrone, Assistant Deputy Public Defender, for defendant-respondent Milton Contreras (Ivelisse Torres, Public Defender, attorney; Ms. Perrone, of counsel and on the brief).
Michael B. Jones, Assistant Deputy Public Defender, for defendant-respondent Mark Diaz (Ivelisse Torres, Public Defender, attorney; Mr. Jones, of counsel and on the brief).
Before Judges KLEINER, PAUL G. LEVY, and CARCHMAN.
*155 The opinion of the court was delivered by KLEINER, J.A.D.
Pursuant to leave to appeal granted, the State appeals a decision suppressing evidence seized from defendant Milton Contreras, which led to the arrest of defendants Contreras and Mark Diaz.[1] We conclude that the motion judge correctly granted defendants' motion to suppress, as the police lacked a reasonable articulable suspicion of criminal activity to stop defendants, and accordingly, we affirm.
We will briefly review the facts which led to defendants' indictment on the following charges: second degree conspiracy, contrary to N.J.S.A. 2C:5-2 (count one); third degree unlawful possession of a controlled dangerous substance, contrary to N.J.S.A. 2C:35-10(a)(1) (count two); second degree possession with intent to distribute a controlled dangerous substance, contrary to N.J.S.A. 2C:35-5(b)(2) (count three); second degree possession with intent to distribute a controlled dangerous substance within 500 feet of a public housing facility, a public park, or a public building, contrary to N.J.S.A. 2C:35-7.1 (count four); and second degree employing a juvenile in a drug distribution scheme, contrary to N.J.S.A. 2C:35-6 (count five).
On March 13, 1998, at approximately 3:00 p.m., New Jersey Transit Police Sergeant Laura Hestor, Officer Allen West, and Officer Frederick Williams were working the eleven-to-seven shift undercover on the New Jersey Transit trains. They were performing "consensual encounters." These "consensual encounters" are conducted because of alleged excessive transportation of illegal contraband, including weapons and drugs, on the trains.
The officers first observed defendants Contreras and Diaz and their companion, L.S., in New York Penn Station. Defendants seemed to be "paying special attention" to some uniformed Amtrak officers who were patrolling the station.[2] L.S. appeared to be "agitated at the fact that the police officers had walked by. He kept looking at them." Officer Williams claimed that none of the other travelers on the platform "seemed to have this kind of [re]action" to the uniformed officers. Defendants "began to talk, whisper, kind of back and forth and turning around and looking at the cops." The New Jersey Transit officers did not overhear any conversation between defendants, nor did they observe any suspicious activity, such as objects being exchanged between them or discarded.
*157 There is some discrepancy as to when the decision to attempt a search was made. Officer Williams testified that once he and the other officers were on the train, they intended to stop defendants and seek permission to search them. However, Williams later testified that they did not approach defendants with an intent to search them. He continued, "[w]e don't approach people with an intent to search them. You know, once we ask questions and we speak with them, ... it maybe [sic] determined that maybe we'll ask for their consent for a search. But we don't automatically approach them with the intent on searching them." The motion judge engaged in a colloquy with the witness regarding this matter. Williams attempted to clarify his testimony by stating that, based on the defendants' behavior when the Amtrak police were near, he and the other officers were "interested in speaking with [the defendants]."
The same issue arose during Sergeant Hestor's testimony. Defense counsel asked her if she and the other officers had decided before leaving New York Penn Station that they would search defendants in Newark. Hestor replied, "we made the decision that, yeah, we were going to talk to them and request a consent to search if they agreed."
When defendants' train arrived, the undercover officers followed them onto the train. The defendants sat together. The officers sat in the same car but apart from one another as they observed defendants. Officer Williams believed that L.S. "seemed to be particularly relieved that they were on the train ... because he was doing things like looking up at the ceiling." The officers observed the three engage in conversation, but defendants did not do anything "out of the ordinary" during the short train ride.
As the train neared Newark, Officer West approached defendants, who were still seated, and identified himself by showing his badge and identification. He also pointed to his fellow officers. West spoke in a low tone of voice so as not to draw attention to the three individuals. West asked the three if they would "mind stepping off the train with [the officers] to speak to [them] for a few moments[,] although they were under no obligation to [do so]." Defendants agreed and accompanied the officers off the train. None of the officers could remember with certainty their exact positioning in relation to the defendants as they exited the train. No weapons were drawn and none of the defendants were handcuffed. Defendants allegedly were free to leave at all times.
According to defendant Diaz, the officers approached them after the train had come to a complete stop and asked them if they would "please get off the train." Diaz claimed that West did not advise them of their right to refuse to get off the train; he did not feel as though he had a choice regarding whether to comply with the request. Diaz felt compelled to exit with the police. Defendants had not intended to get off in Newark because the train would take them directly to Red Bank, their final destination. The officers did not learn of defendants' destination until the group had exited the train. Once off the train, the officers separated the individuals. West "dealt with" Contreras, Hestor spoke to Diaz, and Williams spoke with L.S. West informed Contreras of the problems with passengers using the trains to transport drugs and weapons. He then asked Contreras "if he would have anything of that type on his person." Defendant stated that he did not. West asked him if he would consent to a search, to which defendant responded "that he didn't have anything on him[,] so he had no problem with [West] taking a look." West then offered to conduct the search in the police complex, which is located one level down from the platforms, allegedly to spare defendant the embarrassment of being searched on the crowded platform. Contreras agreed.
Sergeant Hestor testified that she spoke to Diaz. Hestor also informed Diaz of the problems with drugs and contraband being *158 transported on the trains between New York and New Jersey. She asked him if he had anything illegal in his possession, to which he responded that he did not. Hestor then explained what a consent-to-search form is and "asked him if he wouldn't mind signing it...." She told him that he was under no obligation to do so and that, if he agreed to the search, he could stop the search at any time. Diaz agreed to sign the form. He also agreed to go to the police complex to be searched rather than being searched on the platform.
According to Diaz, it was Officer Williams who primarily spoke with him, not Sergeant Hestor. Diaz stated that none of the officers told him that he was free to leave at any time while they were on the platform. Diaz also claimed that no one informed him that he was free to refuse to be searched. Rather, the officers explained the search procedure and then asked defendants to go down to the police complex.
Diaz claimed that Officer Williams "escorted" him downstairs by holding onto his sleeve. As soon as they reached the police complex, defendants were patted down. Diaz stated that he did not feel free to leave at any time and he would have left if he had been told he could do so. He also claimed that he was not shown a consent form until after the pat-down.
Upon arrival at the police complex, Contreras and Diaz were taken to the processing room and L.S. was put in another room. They were separated because adults and juveniles are not permitted to be in the same area in the processing room.
According to the officers, Contreras and Diaz signed consent forms in the processing room before they were searched. Diaz testified, however, that Officer Williams took him to a separate room and questioned him for ten to fifteen minutes. At some point, Officer Williams left him for a time. When he returned, he said to Diaz, "we are having a problem with your boy, he doesn't want to be searched, he doesn't want to sign the consent." Diaz did not know whether Williams was referring to Contreras or L.S. Shortly thereafter, Diaz was told that the officers had found "some substance." He was then strip-searched and arrested based on the evidence found on Contreras. Later, when he was in a cell, "they" came to him with a form and told him to sign for his property.
When Officer West testified, it was revealed that his police report indicated the consent forms were read to defendants and signed by them on the platform. However, the testimony at the suppression hearing reflected that the consent forms were in fact produced at the police complex. West indicated that the defendants were told that their persons, property, and baggage would be searched. They also were reminded that they were under no obligation to sign the form, and that they could stop the search at any time or limit it to certain areas. Contreras reviewed the form and signed it in the presence of all three officers without asking any questions.[3]
The officers testified that defendants were told that they would be permitted to leave when the consensual search was completed. They were told that the officers would put them back on the train to Red Bank "if everything was fine." West conducted a pat-down of Contreras' outer garments and pockets, and a search of his jacket after it was removed. Two clear plastic bags containing crack cocaine were found in the collar of Contreras' jacket. No contraband was found on Diaz. After the crack cocaine was found, all three defendants were placed under arrest. Although an initial search of L.S. incident to his arrest revealed nothing, a later *159 search conducted at the youth facility revealed under fifty grams of marijuana.
The motion judge found that a stop occurred when the officers made themselves known to defendants and subsequently accompanied them onto the platform and down to the police complex. The judge granted the motion to suppress, finding that the officers did not have a reasonable articulable suspicion of criminal activity to conduct the stop.[4]
Not all encounters between police officers and citizens constitute seizures. State v. Davis, 104 N.J. 490, 497, 517 A.2d 859 (1986). In Davis, our Supreme Court reiterated the principle that: [t]he police do not violate the fourth amendment by "merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen...."
[Ibid. (quoting Florida v. Royer, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229, 236 (1983)).]
The Court further noted that field interrogation alone "does not involve `detention' in the constitutional sense so long as the officer does not deny the individual the right to move." Ibid. at 497, 517 A.2d 859 (quoting State v. Sheffield, 62 N.J. 441, 447, 303 A.2d 68 (1973)). Additionally, reasonable suspicion is not a prerequisite to seeking consent to search. State v. Allen, 254 N.J.Super. 62, 66, 603 A.2d 71 (App.Div.1992) (citing 3 LaFave, Search and Seizure: A Treatise on the Fourth Amendment, § 8.1 n. 5.1) (Supp.1991).
We may conclude that the transit police officers were entitled to approach defendants and request consent to search, see Allen, supra, 254 N.J.Super. at 66, 603 A.2d 71; however, we must question whether the encounter with defendants constituted a seizure which required a particularized suspicion before the search was conducted.
Brief investigative seizures do not require the traditional probable cause generally associated with formal arrests. Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L. Ed.2d 889, 905-06 (1968); Davis, supra, 104 N.J. at 499, 517 A.2d 859. They do, however, require "a `particularized suspicion' based upon an objective observation that the person stopped has been or is about to engage in criminal wrongdoing." Davis, 104 N.J. at 504, 517 A.2d 859. Nonetheless, street interrogations or field inquiries may be conducted by police without grounds for suspicion. State ex rel. J.G., 320 N.J.Super. 21, 27, 28, 726 A.2d 948 (App.Div.1999) (citing State v. Alexander, 191 N.J.Super. 573, 576, 468 A.2d 713 (App.Div.1983), certif. denied, 96 N.J. 267, 475 A.2d 570 (1984)).
Seizure is defined in New Jersey as a situation in which, in the totality of the circumstances, "`a reasonable person would have believed that he was not free to leave.'" State v. Tucker, 136 N.J. 158, 164, 642 A.2d 401 (1994) (citing Davis, supra, 104 N.J. at 498, 517 A.2d 859.) Our Supreme Court in Davis characterized the difference between a field inquiry and a Terry-type stop, citing Professor LaFave's treatise on search and seizure, as follows:
"[T]he critical inquiry would be whether the policeman, although perhaps making inquiries which a private citizen would not be expected to make, has otherwise conducted himself in a manner consistent with what would be viewed as a nonoffensive contact if it occurred between two ordinary citizens." ... Thus, an officer would not be deemed to have seized another if his questions were put in a conversational manner, if he did not make demands or issue orders, and if his questions were not overbearing or harassing in nature.
*160 [Davis, supra, 104 N.J. at 497 n. 6, 517 A.2d 859 (quoting LaFave, supra).]
An encounter that begins as consensual "can be transformed into a seizure... if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Id. at 498, 517 A.2d 859 (citation omitted). Thus, we concluded in J.G. that an encounter that initially began as a field inquiry was transformed into a seizure based on the officer's statements to the defendant. 320 N.J.Super. at 31-32, 726 A.2d 948.
The facts in J.G. are strikingly similar to those presented in this case. In J.G., we concluded that the police officer "lacked the requisite reasonable suspicion necessary to stop and interrogate J.G." Id. at 27, 726 A.2d 948. Additionally, we affirmed the trial judge's declination to address the issues of consent and the search incident to arrest because the trial judge correctly concluded that there was no preliminary reasonable suspicion to detain J.G. Ibid. We further concluded that although the encounter began as a field inquiry, it was elevated to a Terry stop when the officer asked J.G. if there was "anything on him that he shouldn't have." Id. at 30-31, 726 A.2d 948. The effect of these words was to make the defendant "aware that he was the subject of a particularized investigation by the questions presupposing the suspicion of criminal conduct. Accordingly, at this point, the field inquiry was automatically converted to a Terry stop which would require a reasonable and articulable suspicion before the search was conducted." Id. at 31-32, 726 A.2d 948.
We stated:
Although a request for consent to search does not necessarily convert a consensual encounter into a seizure as long as the police "do not convey a message that compliance with their request is required,"... we find that by focusing in on J.G.'s backpack, Officer Kelly implied that J.G. was or might be involved in criminal conduct and such focus supports the notion that the juvenile was under investigation and not free to leave. Therefore, we conclude that the encounter with J.G. was not limited to a field inquiry but was expanded into a Terry stop.
[Id. at 32, 726 A.2d 948 (quoting Florida v. Bostick, 501 U.S. 429, 435, 111 S.Ct. 2382, 2386, 115 L. Ed.2d 389, 398-99 (1991)).]
Here, although the encounter may have begun as a consensual one, it clearly appears based on the totality of the circumstances that it was elevated to a detention at some point before the defendants were searched. It is not difficult to conceive that defendants possessed an objectively reasonable belief that they were not free to leave or that compliance with the officers' request was required, despite allegedly having been told numerous times that they were free to leave at any time.
The officers asked the defendants to get off the train in Newark without any question about or regard for defendants' final destination. The officers proceeded to explain that there are "problems" with drugs, weapons, and other contraband being transported on the trains between New York and New Jersey. They then asked defendants if they were carrying any such contraband, a question that clearly conveyed to defendants the message that the officers suspected them of criminal activity. They were asked to go to the police complex to be searched, allegedly to save them the embarrassment of being searched on the platform. Finally, they were told that the officers would put them back on the train to Red Bank after the search was completed, assuming that nothing was found during the search.
Although the officers spoke to defendants in a conversational tone and they did not draw their weapons or use handcuffs, see Davis, supra, 104 N.J. at 497 n. 6, 517 A.2d 859, their questions became "overbearing *161 or harassing in nature" when they asked defendants whether they had any contraband on them. See J.G., supra, 320 N.J.Super. at 31-32, 726 A.2d 948. Thus, the encounter was converted to a seizure requiring a reasonable articulable suspicion before a search was conducted, regardless of any consent given by defendants. See id. at 34, 726 A.2d 948; see also State v. L.F., 316 N.J.Super. 174, 181, 719 A.2d 1272 (App.Div.1998) (holding that where police lacked an articulable suspicion to stop defendants, permission given by defendant to search him was inconsequential).
An objectively reasonable person would not have felt free to leave under such circumstances. The officers' testimony stressed how many choices defendants were given; for example, defendants allegedly were given the option of whether to remain on the train when it stopped or to get off with the officers, whether to speak to the officers or not, whether to be searched or not, and whether to go to the police complex or be searched on the platform. However, in light of all the surrounding circumstances, none of these choices was truly meaningful. While the State may label the encounter as having been "consensual," it effectively was a detention. Even if the officers told defendants that they were free to leave at any time, their other words and actions communicated to defendants that they were not free to leave.
The judge essentially reached the same conclusion after hearing the testimony and assessing the credibility of the witnesses. This determination should be given due deference based on the judge's opportunity to observe "the character and demeanor of [the] witnesses." See State v. Locurto, 157 N.J. 463, 474, 724 A.2d 234 (1999) (declaring that appellate courts should defer to trial courts' credibility findings, which generally are influenced by such matters as "observations of the character and demeanor of witnesses and common human experience that are not transmitted by the record.")
Moreover, once the encounter between the officers and defendants was converted to a seizure, the officers needed at least a reasonable articulable suspicion of some criminal activity to validate the seizure. A search and seizure based on "luck and hunch" is a "combination of insufficient constitutional ingredients." State v. Patino, 83 N.J. 1, 7, 414 A.2d 1327 (1980); J.G., supra, 320 N.J.Super. at 28, 726 A.2d 948. An investigative detention is justifiable "only if the officer has a `particularized suspicion' based upon an objective observation that the person stopped has been or is about to engage in criminal wrongdoing." Davis, supra, 104 N.J. at 504, 517 A.2d 859. The Davis Court continued, "[a] seizure cannot-we emphasize cannot-be justified merely by a police officer's subjective hunch." Id. at 505, 517 A.2d 859.
Here, the officers observed nothing more than defendants "paying special attention" to one or two uniformed officers in Penn Station. This alone was not sufficient to create a reasonable suspicion. Some circumstances in which courts have found a sufficiently articulable basis to conduct a brief stop include: observation of traffic violations; narcotics, packages, money, or other objects being exchanged; reports of recent nearby crimes; and informant's tips that a crime or drug transaction was about to occur. State v. Kuhn, 213 N.J.Super. 275, 280, 517 A.2d 162 (App.Div.1986) (citations omitted); see also State v. Patterson, 270 N.J.Super. 550, 561, 637 A.2d 593 (Law Div.1993), aff'd o.b., 270 N.J.Super. 562, 637 A.2d 599 (App.Div.1994) (finding that defendants' appearance alone, without some conduct evidencing criminal activity, was insufficient to justify a stop). Even running from a police presence cannot alone produce the reasonable articulable suspicion required to validate an investigative detention. State v. Tucker, 136 N.J. 158, 169, 642 A.2d 401 (1994).
*162 The State contends that the trial court abused its discretion because "it rendered its decision not on the facts in issue but due to the [c]ourt's personal objection as to the New Jersey Transit policy of conducting consent searches. In fact[,] the record reveals that the court was not even addressing the issue at bar but the New Jersey Transit policy in general." We have carefully reviewed that contention in light of the entire record, the arguments of counsel, and the applicable law and conclude that the contention is clearly without merit. See R. 2:11-3(e)(2). Although the judge did express disdain for the New Jersey Transit Police policy of conducting consent searches, the judge's findings of fact and conclusions of law make clear that his final decision was based on the facts of the case as presented through the testimony of the parties involved. Additionally, although the judge did not specifically enunciate his credibility findings, he was not required to do so. See State v. Locurto, supra, 157 N.J. at 472-73, 724 A.2d 234. It is, however, clear from the record that the findings of fact by the judge did rest in part upon his assessment of the credibility of the witnesses.
Since we have determined that the officers did not have a reasonable articulable suspicion to detain and search defendants, like the motion judge, it is not necessary for us to consider whether defendants' consent to search was valid.
Affirmed.
NOTES
[1] A juvenile, L.S., was also arrested but has not participated in this appeal. All references to defendants include L.S.
[2] Although both West and Williams recalled two Amtrak officers, Hestor seemed certain that only one was present.
[3] Because L.S. was not proficient in English, a Spanish-speaking officer was summoned to read the consent form to L.S. and to explain his rights to him regarding a consensual search. L.S. refused to sign the consent form.
[4] The judge did not make any findings regarding the validity of the consent obtained by the officers.