**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2373-15T1

STATE OF NEW JERSEY

    Plaintiff-Respondent,

v.

CORY L. CURE,

    Defendant-Appellant.

_____

Submitted May 9, 2017 — Decided July 31, 2017

Before Judges Rothstadt and Sumners.

On appeal from Superior Court of New Jersey,
Law Division, Ocean County, Indictment Nos.
14-03-0591 and 14-12-3067.

Joseph E. Krakora, Public Defender, attorney
for appellant (Rasheedah Terry, Designated
Counsel and on the brief).

Joseph D. Coronato, Ocean County Prosecutor,
attorney for respondent (Samuel Marzarella,
Supervising Assistant Prosecutor, of counsel;
William Kyle Meighan, Assistant Prosecutor, on
the brief).

PER CURIAM

Defendant Corey Cure pled guilty to fourth-degree certain persons not to possess a weapon (metal knuckles), N.J.S.A. 2C:39-7(a), as charged in one indictment, and to fourth-degree tampering with evidence, N.J.S.A. 2C: 28-6(1), as charged in a second indictment. The court sentenced defendant to "time served," an aggregate period of 321 days in jail. Defendant appeals from both convictions, challenging the denial of his motion to suppress as to the weapon he possessed and the denial of his motion to dismiss the indictment as to the tampering charge. For the reasons stated herein, we affirm his conviction for possession of a weapon, but reverse his conviction for tampering.

An Ocean County grand jury initially charged defendant in an indictment on March 18, 2014, with the "certain persons" offense and fourth-degree possession of a prohibited weapon, N.J.S.A. 2C:39-3(e), based on his January 11, 2014 encounter with a police officer. While pending trial, another Ocean County grand jury charged defendant on December 11, 2014 with the tampering offense.

In the weapons offense action, defendant filed a motion to suppress the metal knuckles found in his possession by the arresting officer. That officer was the only witness for the State at the suppression hearing. Defendant and an investigator for the Public Defender's Office testified on behalf of defendant. The facts adduced at the hearing are summarized as follows.

Police officer Allen Mantz testified that, while on patrol at approximately 2:00 p.m. on January 11, 2014, he observed defendant from about two blocks away, walking in the middle of a street, causing passing vehicles to "swerve[] around him." At the time, one sidewalk along the roadway was closed and gated off. According to the officer, defendant was not crossing the road or walking diagonally to get to the other side. Defendant eventually made his way out of the street to a sidewalk, and the officer decided to "stop and talk" to defendant to "make sure everything was okay," that defendant was not intoxicated, or that there was not something wrong with him. Mantz testified there was no "infraction" committed by defendant.

When the officer confronted defendant, he determined defendant was not intoxicated. Mantz asked defendant to remove his hands from his pockets and observed that defendant was wearing "pants and . . . [a] blue or black windbreaker jacket" with deep front pockets, located towards the bottom of his chest, that opened at the top. Additionally, Mantz testified the jacket may have had side pockets.

The officer inquired of defendant as to why he was walking in the middle of the street. Defendant did not reply. The officer sought to obtain defendant's "pedigree" information, as he understood it was required whenever there was "an infraction"

regardless of whether a summons was going to be issued. Mantz asked for a driver's license, but defendant only provided a jail identification card. In response to further inquiry, defendant told the officer that he was coming from one local motel to another, which was close to the area the officer had stopped defendant. The officer understood from prior experience that the motel to which defendant was going was a "high-crime area."

As defendant spoke to Mantz, the officer made several observations about defendant. He noted that defendant had difficulty maintaining eye contact, "stuttered," and appeared "nervous." Moreover, despite the officer's instructions, defendant repeatedly placed his hands in his pockets, requiring Mantz to tell him to remove them several times.

When defendant removed his hands from his pockets after the last direction, Mantz was able to a see what he believed to be a black metal object in defendant's right front pocket. The officer observed a bulge and the top of the object protruding from above the pocket.

After Mantz observed the object, he advised defendant that he was going to "pat him down to make sure [defendant did not] have any weapons on his person." Mantz "initially went right for [defendant's] pocket . . . where [he had seen] the object" and patted down the outside of the pocket using an open flat hand.

4                                          A-2373-15T1

Upon feeling the object, and based on his training, the officer immediately recognized the item as "brass knuckles" and removed them from the pocket. Mantz acknowledged, however, that he had never previously encountered "someone with metal knuckles." Upon discovery of the metal knuckles, the officer placed defendant under arrest, charging him with possession of a prohibited weapon and public nuisance, an ordinance violation.

Defendant presented his version of what transpired on the day of his arrest.[1] According to defendant, he was walking from one motel to the other to retrieve an over-the-counter medication from his sister to give to his child's mother. Defendant testified that he was not walking in the middle of the street, but merely crossed from one side to another. He stated that he did not see any cars on the road and was merely "walking to [his] destination." He also confirmed he was not intoxicated.

Defendant described the jacket he was wearing at the time differently from Mantz's description. According to defendant, it was a large snowboarding jacket with two zippers and five pockets

---

[1] Prior to defendant testifying, the Public Defender's investigator testified to photographs of the area that he took a year after defendant's arrest. In response to the prosecutor's objection, the court ruled that the photographs were inadmissible as not having any relevance. Ultimately, the judge gave no weight to the investigator's testimony.

located in different places — "[t]hree on the bottom, one on the top and one inside."

Defendant stated that when Mantz stopped him, he answered the officer's questions about where he was coming from and going to. Defendant confirmed that he stuttered when he spoke due to his "high anxiety and several mental disabilities."

When asked for identification, defendant took out a stack of identifying documents from his jacket's top pocket and handed the officer a state identification card. At that point, the officer noticed that defendant also had a jail identification card and asked to see that one as well. Defendant complied and while the officer examined the card, defendant placed his hands in his pockets because it was cold. He confirmed that the officer had to tell him twice to remove them and after the second time, he never placed them inside again.

Defendant explained that the officer asked him if he had any weapons and informed defendant he was going to pat him down. Defendant stated that he told the officer he did not consent to the search, but the officer proceeded despite that objection, telling defendant "it [was] too late for that."

After considering the evidence adduced at the hearing, the motion judge denied defendant's suppression motion, placing her reasons on the record on May 1, 2015. The judge observed that

whether the officer's warrantless search of defendant was legal, "turn[ed] on whether the stop . . . was a valid field inquiry that then escalated into [a] lawful . . . investigatory detention supported by a reasonable and articulable suspicion and a lawful Terry[2] frisk."

The judge found the officer's testimony to be "entirely credible" and "consistent" and accepted his version of the events that led to defendant's arrest. She found defendant's testimony to be not "at all credible," explaining in detail the reasons for her conclusion.

The motion judge determined that Mantz had a legitimate concern that defendant may have been intoxicated while walking in the middle of the roadway. The judge noted that Mantz's request for identification was part of a legitimate field inquiry. She found that he had to ask defendant three times to remove his hands from his pockets and, upon asking a third time, Mantz observed a black metal object protruding from the top of his pocket, at which point he patted defendant down for his own safety and, "without manipulating the item," he realized defendant was carrying metal knuckles.

---

2    Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

The judge rejected defendant's contention that by patting him down with an open hand, it would have been impossible for the officer to know there were metal knuckles in his pocket. According to the judge, she examined the knuckles "through the exhibit envelope" and found the officer's testimony about what he discerned from the pat down to "be entirely credible." The judge concluded the officer "had reasonable suspicion based on [d]efendant's continued failure to follow directives to take his hands out of his pockets [and] that the officer['s] . . . observation of a black metal object justifies the pat down search."

Based on the credible testimony and other evidence, the judge concluded that there "was a valid field inquiry, which was permissible without any suspicion at all." She found that defendant's continued detention beyond obtaining his identification was justified, relying upon the officer's observations of what was an ordinance violation, the metal object, and defendant's "demeanor of [stuttering] and failing to . . . follow the directives to take his hands out of his pockets." Accordingly, she concluded that the officer "lawfully frisked" defendant for weapons because he had a reasonable suspicion that that "[d]efendant may have been armed and dangerous." The judge also found that the same facts supported the officer's warrantless

arrest of defendant relying primarily on the officer's observation of the black metal object protruding from defendant's pocket.

In addition to filing the suppression motion, defendant filed a motion to dismiss the indictment that charged him with tampering. That charge arose from an incident that occurred when defendant, who had previously been convicted of burglary, was reporting to probation on September 24, 2014. Before walking through a metal detector, defendant was told to empty his pockets. In response, he stated that that he had nothing in them. When defendant walked through the metal detector, he set off the alarm. A "wanding" of defendant had the same result, at which time defendant removed from his pocket a small piece of paper wrapped in foil that he threw on the ground. A sheriff's detective directed him to pick it up, and after complying defendant swallowed the wrapped paper. At the ensuing hearing before the grand jury, the detective testified that based on his training and experience the item's appearance indicated it contained "some sort of controlled dangerous substance [(CDS)]." Based on the detective's testimony, the grand jury issued its indictment.

The same motion judge considered defendant's motion to dismiss the indictment. At the hearing, defense counsel argued that there was no evidence that the small wrapped paper contained any CDS and that defendant complied with the detective's only

instruction, which was to pick up what he threw down. Counsel argued those facts were insufficient to establish defendant committed an act of tampering. The prosecutor disagreed, arguing that once the metal detector alarm went off, an investigation commenced and that defendant's swallowing of the item evinced an "inten[tion] to destroy the evidence."

The motion judge concluded there was sufficient evidence to support the charge and denied defendant's motion. In her oral decision, the judge concluded that defendant was familiar with the process of going through the metal detectors and knew that if the metal detector alarm went off "there is going to be an investigation, that he is going to be wanded and probed further." Turning to the elements of the offense, the judge observed that passing through the detector was not an "official proceeding" but was "certainly . . . an investigation pending or about to be instituted."

Defendant pled guilty to the two offenses, and the judge sentenced him in accordance with his plea agreement. This appeal followed.

On appeal, defendant argues:

> POINT I
>
> THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED DEFENDANT'S SUPPRESSION MOTION BECAUSE THE POLICE SUBJECTED DEFENDANT TO A

10

WARRANTLESS SEARCH AND SEIZURE WITHOUT CONSTITUTIONAL JUSTIFICATION.

> A. Officer Mantz Did Not Have A Constitutional Basis To Stop and Question Mr. Cure.
>
> 1. Officer Mantz's Initial Stop of the Defendant Went Beyond the Scope of a Field Inquiry.
>
> 2. Officer Mantz Conducted An Investigatory Stop Without A Constitutional Basis.
>
> B. Officer Mantz Did Not Have A Constitutional Basis To Conduct A [Terry] Search Of The Defendant.

POINT II

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED DEFENDANT'S MOTION TO DISMISS THE INDICTMENT.

We turn first to defendant's challenge to the denial of his motion to suppress. We review a motion judge's factual findings in a suppression hearing with great deference. State v. Gonzales, 227 N.J. 77, 101 (2016). In our review of a "grant or denial of a motion to suppress [we] must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Gamble, 218 N.J. 412, 424 (2014); see also State v. Rockford, 213 N.J. 424, 440 (2013). We defer "to those findings of the trial judge which are substantially influenced by his

11

opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Elders, 192 N.J. 223, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). We owe no deference, however, to the trial court's legal conclusions or interpretation of the legal consequences that flow from established facts. Our review in that regard is de novo. State v. Watts, 223 N.J. 503, 516 (2015); State v. Vargas, 213 N.J. 301, 327 (2013).

Applying this standard of review, we conclude that defendant's arguments relating to the denial of his suppression motion are without merit. We affirm substantially for the reasons expressed by the motion judge. We add the following comments.

The constitutional requirements for a field inquiry and an investigatory stop are different. "A field inquiry is essentially a voluntary encounter between the police and a member of the public in which the police ask questions and do not compel an individual to answer." State v. Rosario, ____ N.J. ____, ____ (2017) (slip op. at 17). A field inquiry is the least "intrusive[] . . . encounter[] with police." Ibid.; see also State v. Pineiro, 181 N.J. 13, 20 (2004). Indeed, "[t]he individual does not even have to listen to the officer's questions and may simply proceed on [his or] her own way." Id. at 18. "The test of a field inquiry is 'whether [a] defendant, under all of the attendant

circumstances, reasonably believed he [or she] could walk away without answering any of [the officer's] questions." Ibid. (alteration in original) (quoting State v. Maryland, 167 N.J. 471, 483 (2001)). So long as the officers "questions were put in a conversational manner, if he [or she] did not make demands or issue orders, and if his [or her] questions were not overbearing or harassing in nature," id. at 21 (quoting State v. Davis, 104 N.J. 490, 497 n.6 (1986)), the interaction "could be treated as [a] field inquiry." Ibid.

Unlike a field inquiry, an investigatory stop, also referred to as a Terry stop, is characterized by a detention in which the person approached by a police officer "would feel 'that his or her right to move has been restricted,'" even though the encounter falls short of a formal arrest. Id. 17-18 (quoting State v. Rodriquez, 172 N.J. 117, 126 (2002)); see also Terry, supra, 392 U.S. at 19, 88 S. Ct. at 1878-79, 20 L. Ed. 2d at 904. An investigatory stop "is a temporary seizure that restricts a person's movement"; accordingly, "it must be based on an officer's reasonable and particularized suspicion . . . that an individual has just engaged in, or was about to engage in, criminal activity." Id. at 18-19 (quoting State v. Stovall, 170 N.J. 346, 356 (2002)). "During such a stop, if the police officer believes that the suspect 'may be armed and presently dangerous,' then he may conduct

a pat down" for the officer's safety. State v. Williams, 192 N.J. 1, 18 (2007) (quoting Terry, supra, 392 U.S. at 30, 88 S. Ct. at 1884, 20 L. Ed. 2d at 911).

Applying these principles, we agree that defendant's initial encounter with Mantz amounted to no more than a field inquiry and escalated to an investigatory stop once the officer observed the metal object protruding from defendant's pocket and inquired about whether defendant possessed any weapons. See State v. Contreras, 326 N.J. Super. 528, 540 (App. Div. 1999) (asking the defendants whether they were in possession of contraband escalated field inquiry into an investigative detention); State ex rel. J.G., 320 N.J. Super. 21, 25, 31-32 (App. Div. 1999) (asking juvenile if there was "anything on him that he shouldn't have" converted field inquiry into a Terry stop). The officer's observation of the metal object and defendant's behavior and demeanor in an area known to be a high crime location, provided the objective observations needed to support the officer's suspicion that defendant might be in possession of a weapon and warranted the detention and search of defendant and seizure of the metal knuckles.

We part company with the judge as to her decision to deny defendant's motion to dismiss the tampering indictment. We review a trial court's decision to deny a motion to dismiss an indictment

14                                                              A-2373-15T1

for a clear abuse of discretion. State v. Zembreski, 445 N.J. Super. 412, 424 (App. Div. 2016). "However, if a trial court's discretionary decision is based upon a misconception of the law, a reviewing court owes that decision no particular deference." Ibid. (quoting State v. Lyons, 417 N.J. Super. 251, 258 (App. Div. 2010)).

In our review of the motion judge's decision, we recognize that granting a motion to dismiss an indictment should occur only in limited circumstances. As we have stated:

> One of the guiding principles to be followed by a court when considering a motion to dismiss an indictment is that "a dismissal of an indictment is a draconian remedy and should not be exercised except on the clearest and plainest ground." State v. Williams, 441 N.J. Super. 266, 271 (App. Div. 2015) (alteration omitted) (quoting State v. Peterkin, 226 N.J. Super. 25, 38 (App. Div.), certif. denied, 114 N.J. 295 (1988)). Therefore, once returned by a grand jury, an indictment should be disturbed "only when [it] is manifestly deficient or palpably defective." State v. Hogan, 144 N.J. 216, 228-29 (1996).

> [Zembreski, supra, 445 N.J. Super. at 424-25.]

With those cautionary instructions in mind, we are still compelled to find that the motion judge misapplied her discretion in this case because there was a lack of evidence as to all of the elements required for tampering. A criminal "tampering" occurs when a person, "<u>believing that an official proceeding or</u>

investigation is pending or about to be instituted, . . . [a]lters, destroys, conceals or removes any article, object, record, document or other thing of physical substance with purpose to impair its verity or availability in such proceeding or investigation."  N.J.S.A. 2C:28-6(1) (emphasis added).  "To be found guilty of this offense, a person must be found to have not simply hidden criminal contraband or evidence but to have engaged in conduct that resulted in 'the permanent alteration, loss or destruction of the evidence.'"  State v. Kennedy, 419 N.J. Super. 475, 479 (App. Div.) (quoting State v. Mendez, 175 N.J. 201, 212 (2002)), certif. denied, 208 N.J. 369 (2011).  Moreover, the person's purpose in engaging in such conduct must have been "to impair [the physical evidence's] verity or availability in [an official] proceeding or investigation."  Ibid. (alteration in original) (emphasis added) (quoting N.J.S.A. 2C:28-6(1)).  Where the physical evidence is alleged to be CDS, the "statute does not require the State to prove that the object [destroyed] was [CDS], only that it was an 'article, object, record, document or other thing of physical substance[,]' in addition to the other elements enumerated under [the statute]."  Mendez, supra, 175 N.J. at 214.

Unlike the motion judge, we do not include in the definition of a "proceeding or investigation" the public's contact with law enforcement at a security checkpoint before entering a public

building. That type of encounter is a far cry from a defendant being pursued by officers who suspect him of having committed a crime. See id. at 204-07 (affirming a conviction for tampering with evidence where a defendant discarded and destroyed cocaine during a police car chase by emptying a clear bag of white powder while police watched). A police pursuit obviously places a defendant on notice that he is the subject of an investigation; whereas, an encounter with a security guard tasked with preventing weapons from entering a building would not.[3] Moreover, the

---

[3] We note that defendant was not charged with hindering his own apprehension under N.J.S.A. 2C:29-3(b)(1), which does not include as an element a defendant's belief that an official proceeding or investigation involving his conduct is or is about to be pursued by law enforcement. That statute states in pertinent part:

> b. A person commits an offense if, with purpose to hinder his own detention, apprehension, investigation, prosecution, conviction or punishment for an offense or violation . . . he [or she]:
>
> (1) Suppresses, by way of concealment or destruction, any evidence of the crime . . . which might aid in his discovery or apprehension or in the lodging of a charge against him . . . .
>
> [Ibid.]

To convict a defendant of the offense, the State is required to prove:

> (1) that defendant knew he/she could/might be charged with [an offense];

officer's response following defendant tossing the object to the floor, which was simply to ask him to pick it up, does not support the inference that defendant was then aware that he was the subject of an investigation. Because there was no evidence that defendant believed that an official proceeding or investigation was about be instituted against him, the tampering conviction must be reversed.

Affirmed in part; reversed and remanded in part for entry of an order vacating defendant's indictment, conviction and sentence for tampering, N.J.S.A. 2C:28-6(1). We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

> (2) that [] defendant suppress[ed], by way of concealment or destruction, any evidence of the crime . . . which might aid in his[/her] discovery or apprehension or in the lodging of a charge against him; and
>
> (3) that [] defendant acted with purpose to hinder his/her own detention, apprehension, investigation, prosecution, conviction, or punishment.
>
> [Model Jury Charge (Criminal), "Hindering One's Own Apprehension or Prosecution" (2014).]

A-2373-15T1