726 A.2d 948

STATE, IN INTEREST OF J.G.

Superior Court of New Jersey
Appellate Division

Argued March 17, 1999—Decided April 1, 1999.

Before Judges A.A. RODRIGUEZ and KIMMELMAN.

*Paul Condon,* Assistant Prosecutor, argued the cause for appellant, (*Thomas V. Manahan,* Union County Prosecutor, attorney; *Mr. Condon,* on the brief).

*Paul M. Klein,* Deputy Public Defender II, argued the cause for respondent (*Ivelisse Torres,* Public Defender, attorney; *Mr. Klein,* on the brief).

The opinion of the court was delivered by

KIMMELMAN, J.A.D.

On August 11, 1998, Judge Rudolph Hawkins entered an order granting J.G.'s motion to suppress the evidence of a controlled dangerous substance (CDS) as the fruit of an unreasonable search and seizure.

We granted the State's motion for leave to appeal on September 24, 1998. We now affirm.

I

At approximately 7:30 a.m. on the morning of September 20, 1997, Officer Darryl Kelly of the transit police was on uniformed patrol at Pennsylvania (Penn) Station in Newark. While standing alone in the main concourse section of the station where disembarking passengers pass to board trains bound for New York City, Officer Kelly observed two individuals later identified as Michael Tarantino and J.G., a juvenile, depart from track five and come down the stairs to the main concourse.

According to Officer Kelly, the juvenile made prolonged eye contact for two or three paces with Kelly before looking down at the floor and hurrying his pace. In doing so, the juvenile bumped into Tarantino's back. The two travellers continued to track one to board a New York City-bound train. Upon Officer Kelly's arriving at track one's platform, the train had already departed for New York City.

Because they fit the profile of typical drug traffickers in the New York/Newark drug corridor,[1] Officer Kelly suspected that the pair was drug trafficking. Kelly determined that he would be on the look-out for J.G. and Tarantino to see if they came back through Penn Station within the brief time frame typical of a CDS transaction.

At approximately 9:48 a.m., Officer Kelly observed the pair at a newsstand. As the pair ascended an elevator to board the Raritan Valley Train, Kelly followed them with the intention of engaging them in conversation. Kelly "got up as close as I possibly could without them detecting my presence." At about two feet from the top of the escalator, J.G. turned around and looked surprised when he saw Kelly on the step behind him. Tarantino, who was in

---

[1] At the suppression hearing Kelly explained that a common "M.O." for drug carriers is to travel in pairs with one carrying drugs and the other leading the way as a lookout for the police. Often times the pair will consist of an adult and a juvenile because a juvenile will arouse less suspicion.

front of J.G. proceeded to switch places with J.G. so that Tarantino now stood between J.G. and Officer Kelly.

After Officer Kelly reached the top of the escalator, Tarantino engaged Officer Kelly in a conversation about his train ticket. Officer Kelly informed Tarantino that he could not help him. Kelly then asked Tarantino if he could ask him a few questions; to which Tarantino answered, "No problem."

Officer Kelly asked Tarantino from where he and his companion had come. Tarantino initially answered what sounded to Officer Kelly like "Brooklyn." However, upon Officer Kelly's request for clarification, Tarantino informed Officer Kelly that they were returning from "the Village." At this time, J.G. appeared nervous to Officer Kelly. Speaking in a conversational tone as they walked to the train platform, Officer Kelly asked Tarantino if there was "anything on him that I should know about." Tarantino replied "No. You can check me out." Officer Kelly followed-up, "You don't mind if I check you out?" Tarantino stated that Kelly could; in so declaring, Tarantino began to perform a pat-down of himself. Officer Kelly's subsequent search revealed no contraband on Tarantino.

All the while, J.G. was standing in the immediate vicinity of Tarantino and Officer Kelly. At no time did Officer Kelly draw his weapon, threaten either Tarantino or J.G. or restrain their movement. Officer Kelly never told them that they had to stop or that they were not free to leave.

Officer Kelly then asked J.G. if there was "anything on him that he shouldn't have." The juvenile looked at Tarantino and then stated "No." Officer Kelly followed-up, "Do you mind if I check you out?" [2] Kelly testified that J.G. said "Go ahead." As Officer Kelly conducted his pat-down of J.G. he told J.G. "You know you

---

[2] Although Kelly admitted he was familiar with written consent to search forms, he did not use them in this encounter because he asserted that there were none at the transit police station at Penn Station.

don't have to do this." To which the juvenile again only replied, "Go ahead."

Officer Kelly's pat-down search and revealed a box containing three cigar holders in the juvenile's pocket. The cigar holders were of a brand ("Philly Blunts") that Officer Kelly knew were associated with the smoking of marijuana. Officer Kelly then asked the juvenile what was in his backpack. Tarantino interjected that it was only their jackets. Kelly then asked the juvenile "Do you mind if I search the backpack." To which the juvenile responded "No. Go ahead." After his reply J.G. turned his back to Officer Kelly, exposing the backpack so Officer Kelly could more easily search it. At this moment, Officer Kelly described J.G. as being in a state of "sheer panic," although he did not appear to be under the influence of drugs.

Officer Kelly's search of the backpack revealed four plastic bags containing 100 smaller plastic bags; bags which Officer Kelly recognized from his experience as CDS paraphernalia.

Upon discovery of the paraphernalia, Officer Kelly arrested J.G. A subsequent more thorough search of the backpack incident to J.G.'s arrest revealed three plastic bags containing a green leafy substance, which tested positive as 11.4 ounces of marijuana.

On September 25, 1997, J.G. was charged as a juvenile delinquent for (1) possession of marijuana with the intent to distribute, in violation of *N.J.S.A.* 2C:35–5b(11); (2) possession of marijuana, in violation of *N.J.S.A.* 2C:35–10; (3) distribution of drug paraphernalia, in violation of *N.J.S.A.* 2C:36–3; (4) possession of drug paraphernalia with the intent to distribute, in violation of *N.J.S.A.* 2C:36–2; and (5) conspiracy to distribute marijuana, in violation of *N.J.S.A.* 2C:5–2a.

On October 3, 1993, the juvenile moved to suppress the evidence of marijuana seized. A formal hearing was held and on July 27, 1998, the motion to suppress was granted, and Judge Hawkins issued a written opinion stating in pertinent part,

It would appear that [neither] the juvenile nor his companion did anything overtly which would have suggested that they were involved in some illegal activity. It does appear that the officer acted out of a sense or suspicion based solely on the fact that they were in the station in the morning, left the station for New York and returned shortly thereafter.

I am not convinced that there was anything about the conduct of this juvenile or his companion which would have justified the inquiry made by this officer. I am not convinced that the circumstances were such that they lent themselves to an articulable suspicion that anything unlawful had taken place and that this Officer was motivated solely on a hunch. It is my judgment that this is not enough.

The State appeals, arguing that (1) Officer Kelly lawfully searched and seized the evidence of narcotics from the juvenile; (2) the juvenile's consent to the search was voluntary and knowing; and (3) the search incident to arrest was lawful.

## II

We hold that there was no error in granting the motion to suppress the evidence because Officer Kelly lacked the requisite reasonable suspicion necessary to stop and interrogate J.G. Because we find that there was no preliminary reasonable suspicion for Officer Kelly to detain J.G. we need not reach the issues of consent and the search incident to arrest.

### a. Officer Kelly's Field Inquiry Was Converted by Him to a Terry Stop Requiring Reasonable Suspicion

Generally, a police officer charged with the duty of crime detection and prevention and protection of public safety must deal with a rich diversity of street encounters with citizens. In a given situation, even though a citizen's behavior does not reach the level of "highly suspicious activities," the officer's experience may indicate that some investigation is in order. Depending on the circumstances, street interrogation may be most reasonable and proper. *State v. Sheffield,* 62 *N.J.* 441, 446, 303 *A.*2d 68, *cert. denied,* 414 *U.S.* 876, 94 *S.Ct.* 83, 38 *L. Ed.*2d 121 (1973) (citing *Adams v. Williams,* 407 *U.S.* 143, 144–47, 92 *S.Ct.* 1921, 1922–24, 32 *L. Ed.*2d 612, 616–17 (1972)). Police may conduct a street interrogation or field inquiry without grounds for suspicion. *State*

*v. Alexander,* 191 *N.J.Super.* 573, 576, 468 *A.*2d 713 (App.Div. 1983), *certif. denied,* 96 *N.J.* 267, 475 *A.*2d 570 (1984).

The police do not violate the Fourth Amendment by "merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if he is willing to listen, or by offering as evidence in a criminal prosecution his voluntary answers to such questions." *State v. Davis,* 104 *N.J.* 490, 497, 517 *A.*2d 859 (1986) (citing *Florida v. Royer,* 460 *U.S.* 491, 497, 103 *S.Ct.* 1319, 1324, 75 *L. Ed.*2d 229, 236 (1983)). Thus, a field inquiry, without more, by a police officer does not involve "detention" in the constitutional sense so long as the officer does not deny the individual the right to move. *State v. Sheffield, supra,* 62 *N.J.* at 447, 303 *A.*2d 68. Therefore, a request for consent to search does not convert a street interrogation, field inquiry or consensual encounter into a seizure as long as the police "do not convey a message that compliance with their request is required." *Florida v. Bostick,* 501 *U.S.* 429, 435, 111 *S.Ct.* 2382, 2386, 115 *L. Ed.*2d 389, 398–99 (1991).

Conversely, even a brief detention short of traditional arrest must be founded on constitutionally recognized objective justification. *State v. Bynum,* 259 *N.J.Super.* 417, 421, 614 *A.*2d 156 (App.Div.1992) (citing *United States v. Mendenhall,* 446 *U.S.* 544, 551, 100 *S.Ct.* 1870, 1875, 64 *L. Ed.*2d 497, 507 (1980)). It follows that while a traditional arrest must be supported by probable cause, a police officer may briefly detain an individual only where the officer can point to specific and articulable suspicion. *Ibid.* (citing *Terry v. Ohio,* 392 *U.S.* 1, 20, 88 *S.Ct.* 1868, 1880, 20 *L. Ed.*2d 889, 906 (1968)). Therefore, evidence from the conduct of a search and seizure that is merely the "product of luck and hunch" is a "combination of insufficient constitutional ingredients." *State v. Patino,* 83 *N.J.* 1, 6, 414 *A.*2d 1327 (1980).

New Jersey defines a seizure as a situation where considering all of the circumstances "a reasonable person would feel that he was not free to leave." *State v. Tucker,* 136 *N.J.* 158, 164, 642

*A*.2d 401 (1994) (citing *State v. Davis, supra,* 104 *N.J.* 490, 517 *A*.2d 859 (1986)). As to delineating the difference between a field inquiry and a brief detention where the individual's freedom to walk away is restrained (a so-called *"Terry* [3] stop") our Supreme Court in *State v. Davis, supra,* cited Professor Wayne Lafave's treatise on search and seizure observing that,

> "[T]he critical inquiry would be whether the policeman, although perhaps making inquires which a private citizen would not be expected to make, has otherwise conducted himself in a manner consistent with what would be viewed as nonoffensive contact if it occurred between two ordinary citizens." W.R. Lafave, 3 *Search and Seizure,* § 9.2 at 5.3. Thus, an officer would not be deemed to have seized another if his questions were put in a conversational manner, if he did not make demands or issue orders, and if his questions were not overbearing or harassing in nature. *Id.* at 53–54.
>
> [*State v. Davis,* 104 *N.J.* at 497 n. 6, 517 *A*.2d 859.]

Therefore, in *State v. L.F.,* 316 *N.J.Super.* 174, 719 *A*.2d 1272 (App.Div.1998), we applied *Tucker, supra,* and *Davis, supra,* to determine that the police lacked articulable suspicion to stop and confront a person based on the mere act of a suspect putting something from his hand into his own pocket while departing alone from the view of police who were patrolling a high crime area and knew the suspect as a person having a criminal record. *State v. L.F., supra,* 316 *N.J.Super.* at 176–79, 719 *A*.2d 1272. As a result, despite the suspect's subsequent granting of permission to search him which resulted in the discovery of narcotics, the evidence was suppressed. *Id.* at 181, 719 *A*.2d 1272.

In the instant case, the State argues that the trial court erred in ruling that Officer Kelly's inquiry of J.G. required reasonable and articulable suspicion. The State reasons this was encounter was similar to a field inquiry because the encounter was initiated by Tarantino and at all times J.G. was free to leave. Additionally, the encounter took place in public in Penn Station. Officer Kelly, though in uniform, neither drew his weapon nor physically gestured that the pair was not free to leave, and the conversation was conducted in an unexceptional tone and manner. Thus, the State

---

[3] *Terry v. Ohio,* 392 *U.S.* 1, 88 *S.Ct.* 1868, 20 *L. Ed.*2d 889 (1968).

contends that the encounter between J.G. and Officer Kelly was nothing more than a non-detentional approach and field inquiry rather that rising to the level of a *Terry* stop.

It is argued that once Officer Kelly was properly in position to make a field inquiry there was nothing unconstitutional in his asking J.G. for consent to search his backpack because there is no requirement of reasonable suspicion as a prerequisite to seeking consent. *State v. Allen,* 254 *N.J.Super.* 62, 66, 603 *A.*2d 71 (App.Div.1992), *quoting* W.R. Lafave, 3 *Search and Seizure,* § 8.1 n. 5.1. (Supp.1992).

■ Although the foregoing is a correct statement of the law as a general proposition, the principle may not be applied to the facts of this case. While the encounter here was initiated by Tarantino and was non-confrontational, it was akin to the *Terry* stop confrontation of the suspect in *State v. L.F., supra.* Although the facts in this case support an initial finding that Officer Kelly was lawfully in J.G.'s and Tarantino's presence pursuant to a field inquiry which does not require reasonable suspicion, *see State v. Alexander, supra,* 191 *N.J.Super.* at 576, 468 *A.*2d 713, we find that Officer Kelly's subsequent questions presupposing criminal activity, i.e., "you do not have anything you shouldn't," converted the field inquiry into a *Terry* stop detention, which requires articulable suspicion.

We note Professor Lafave's standard as referenced by our Supreme Court in *State v. Davis,* 104 *N.J.* at 497 note 6, 517 *A.*2d 859, to the effect that an officer would not be deemed to have seized a person if (1) his questions were put in a conversational manner, (2) if he did not make demands or issue orders, and (3) if his questions were not overbearing or harassing in nature. Here, some of the facts in an isolated context could initially support a finding for a mere field inquiry. As threshold matters, the inquiry was made in a public place, Penn Station, and the initial conversation was initiated by Tarantino, and not by Officer Kelly. The record also shows that (1) the conversation was conducted in an unexceptional tone and manner; and (2) Officer Kelly did not

make any demand or issue orders; instead he asked where the pair was coming from and if they minded if he searched them.

However, the third factor for finding that the approach was limited to a field inquiry was lacking. We consider Officer Kelly's initial words to J.G. to have been unduly authoritative, indicative of a criminal suspicion, and harassing. Specifically, Officer Kelly asked the juvenile if there was "anything on him that he shouldn't have."

Generally, courts throughout the country have ruled that a field inquiry becomes a *Terry* stop upon "unsupported outright accusations of criminal activity." *See generally,* Lafave, 3 *Search and Seizure,* § 9.3(a); *see, e.g., United States v. Millan,* 912 *F.*2d 1014, 1016 (8th Cir.1990) (encounter became seizure when agent began questioning suspect about drugs); *United States v. Berryman,* 717 *F.*2d 651, 655–56 (1st Cir.1983) (a reasonable person would not feel free to walk away when, after answering truthfully questions about identification and travel itinerary, further questions with the suspicion of drug trafficking converted encounter into a seizure); *United States v. Berry,* 670 *F.*2d 583, 603 (5th Cir.1982) (effect of statements by officers that individual was suspected of drug trafficking intimated that an investigation focused on specific individual could reasonably induce suspect to concluded he was not free to leave and that failure to cooperate would result in formal detention). *But see United States v. Tavolacci,* 895 *F.*2d 1423, 1425 (D.C.Cir.1990) (officer's explanation that he was with drug interdiction unit in response to suspect's question did not convert encounter into a seizure without a specific characterization that individual was a suspect).

Here, the effect of Officer Kelly's words leads us to conclude that J.G. was made aware that he was the subject of a particularized investigation by the questions presupposing the suspicion of criminal conduct. Accordingly, at this point, the field inquiry was automatically converted to a *Terry* stop which would require a reasonable and articulable suspicion before the search was con-

ducted. The court below properly found the requisite factors to be lacking.

Although a request for consent to search does not necessarily convert a consensual encounter into a seizure as long as the police "do not convey a message that compliance with their request is required," *Florida v. Bostick, supra,* 501 *U.S.* at 435, 111 *S.Ct.* at 2386, 115 *L. Ed.*2d at 398–99, we find that by focusing in on J.G.'s backpack, Officer Kelly implied that J.G. was or might be involved in criminal conduct and such focus supports the notion that the juvenile was under investigation and not free to leave. Therefore, we conclude that the encounter with J.G. was not limited to a field inquiry but was expanded into a *Terry* stop.

> b. *Officer Kelly Lacked The Requisite Reasonable Suspicion for a Terry Stop.*

We do not find from the factual circumstances and from the sequence of events that the encounter with Tarantino and J.G. was sufficient to rise to the level of a reasonable articulable suspicion that a crime was occurring or going to occur. Therefore, in the absence of such degree of suspicion necessary for a *Terry* stop, Officer Kelly's search and seizure violated the Fourth Amendment's bar against unreasonable search and seizures.

In *State v. Kuhn,* 213 *N.J.Super.* 275, 282, 517 *A.*2d 162 (App.Div.1986), we found that the presence of a white and two hispanic males in a high crime area which met the profile of a drug transaction did not give rise to reasonable suspicion for police to stop and detain an automobile. *Id.* at 282, 517 *A.*2d 162. Accordingly, the subsequent search resulting in the discovery of narcotics in the automobile and its trunk had to be suppressed. *Ibid.*

Similarly, in *State v. Patterson,* 270 *N.J.Super.* 550, 558–60, 637 *A.*2d 593 (Law Div.1993), *aff'd o.b.,* 270 *N.J.Super.* 562, 637 *A.*2d 599 (App.Div.1994), we found the stopping of taxi-cab in Red Bank in which two African Americans were about to become passengers was not reasonable suspicion to stop the vehicle, despite the fact

that the passengers and the circumstances fit the drug courier profile of drug transportation in the Red Bank/Asbury Park area. Accordingly, the evidence that was the product of such an unlawful seizure was suppressed. *See Ibid.*

The State argues that the series of events rose to a level which suggested that there was criminal conduct occurring. The State cites the fact that Penn Station was part of the "drug corridor" and that couriers travel in pairs, often with a minor just like the episode observed by Officer Kelly. The pair's back-and-forth trip fit the typical time frame of a narcotics trip. Additionally, upon Officer Kelly's conversation with Tarantino he received conflicting answers (first Brooklyn and then the "Village") and he noticed that the juvenile was in a state of panic during their conversation. Thus, taken as a whole, the State contends that Officer Kelly's suspicions were reasonably heightened to a point of articulable suspicion. Upon having such a reasonable suspicion, it is suggested that Officer Kelly was within his legal rights when he requested the pair's consent to search them and informed J.G. that he possessed a right to refuse a search, i.e., "[y]ou know you don't have to do this." As a result of the consent search we are asked to hold that, Officer Kelly lawfully discovered the drugs.

We cannot so conclude. We find that in this case Officer Kelly's hunch to detain the travelers was based on a drug courier profile and not upon the specific overt conduct of J.G. and Tarantino. Accordingly, as we found in *Kuhn, supra,* and *Patterson, supra,* Officer Kelly did not have reasonable or articulable suspicion to stop and subsequently search J.G. At most, Officer Kelly observed a young man who was travelling with Mr. Tarantino back from New York who became nervous in the officer's presence; no narcotics transaction or objectively suspicious movement was ever observed.

Thus, Judge Hawkins' ruling and factual conclusions based on his "feel of the case" may not be disturbed on appeal. His decision was based on credible evidence in the record which is fully supportive of his conclusion that there was no reasonable and

articulable suspicion. *See State v. Johnson,* 42 *N.J.* 146, 162, 199 *A.*2d 809 (1964); *State v. Kasabucki,* 52 *N.J.* 110, 117, 244 *A.*2d 101 (1968); *see also Rova Farms Resort, Inc. v. Investors Ins. Co. of America,* 65 *N.J.* 474, 496, 323 *A.*2d 495 (1974).

## III

■ Accordingly, where a police officer lacks the requisite articulable or reasonable suspicion to raise a field inquiry into brief detention or *Terry* stop, it is inconsequential whether the search of a suspect's person was conducted with or without his permission because the police did not have an adequate basis for stopping him or her at all, i.e., the essential preliminary step to search. *See State v. L.F., supra,* 316 *N.J.Super.* at 181, 719 *A.*2d 1272. Therefore, we need not reach the issues of consent and the search incident to arrest.

We are in substantial accord with Judge Hawkins' letter opinion dated July 27, 1998. The order of suppression entered August 11, 1998, is affirmed.