Filed 12/26/14 P. v. Sanchez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E058674 |
| v. | (Super.Ct.No. SWF1203161) |
| ENRIQUE SALINAS SANCHEZ, | O P I N I O N |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Michael J. Rushton, Judge. Affirmed.

Thomas E. Robertson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Anthony Da Silva and Randall D. Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I. INTRODUCTION

A jury found defendant and appellant Enrique Salinas Sanchez guilty as charged of forcibly resisting arrest (Pen. Code, § 69)[1] and possessing methamphetamine (Health & Saf. Code, § 11377, subd. (a)).  In a bifurcated proceeding, defendant admitted having five prison priors (§ 667.5, subd.(b)), and three prior strike offenses (§ 667, subds. (c), (e)(2)(A)).  Defendant was sentenced to 11 years in prison:  six years (the middle term, doubled) on the forcibly resisting arrest conviction, plus five years for each prison prior.

On this appeal, defendant claims (1) the trial court erroneously denied his motion for acquittal (§ 1118.1) on the resisting arrest charge, and (2) insufficient evidence supports his conviction for forcibly resisting arrest.[2]  We conclude the motion for acquittal was properly denied and substantial evidence supports the conviction.  We therefore affirm the judgment.[3]

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

[2]  In his opening brief, defendant requested an independent review of the sealed record of the trial court's in camera review of the arresting officer's file under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.  Defendant has since withdrawn this request.

[3]  In case No. E060592, defendant has petitioned this court for a writ of habeas corpus, claiming his admission of the first of the five alleged prison priors was a product of the ineffective assistance of his counsel, and his 11-year sentence must therefore be reduced by one year, the term imposed on the defective prison prior.  The Attorney General concedes the petition has merit because the first alleged prison prior could not be proved.  We have considered the writ petition with this appeal and also agree it has merit. By a separate order in the writ proceeding, we grant the relief requested in the petition and reduce defendant's 11-year sentence by one year, to 10 years.

## II.  PROCEDURAL BACKGROUND

A. *Prosecution Evidence*

Around 4:45 p.m. on September 3, 2012, Riverside County Sheriff's Department Deputy Raul Ochoa was patrolling a rural two-lane road in a high crime area when he noticed a red Mitsubishi car parked on the side of the road.  A woman was standing by the driver's side, and defendant was standing by the passenger side.  The deputy parked his patrol vehicle parallel to the car, got out of the patrol car, and approached the woman.  After asking her something like, "how is it going, what's going on," the deputy patted the woman down for weapons.  As the deputy was searching the woman for weapons, defendant walked to the rear of the car and opened the trunk.

Deputy Ochoa became nervous, and met defendant at the rear of the car just as he was opening the trunk.  The deputy did not see any weapons inside the trunk, and asked defendant whether he was on probation or parole.  Defendant did not respond and started to run.  As he ran past the deputy, he looked over his shoulder and reached for the front of his waistband.  The deputy struck defendant in the face with his fist and ordered him to show his hands.  Defendant swung back with his fist, but missed, fell forward, and landed on his stomach with his hands underneath him.  The deputy fell on top of defendant, positioned his weight towards defendant's upper left shoulder, and ordered defendant to show his hands, but defendant continued reaching towards his waistband, with his hands still underneath his body.  The deputy struck defendant in the upper jaw area two or three times with his fist.

As defendant continued reaching for his waistband, Deputy Ochoa pulled out his Taser gun and tased defendant in the lower back, but the shot was ineffective because one of the darts failed to deploy.  As the deputy attempted to reload his Taser gun, defendant rolled over onto his side, removed two items from his person, threw them to the side, and rolled back onto his stomach.  The deputy tased defendant again, and this time the deployment was successful.  After the taser completed its cycle, defendant complied with the deputy's order to show his hands.

After handcuffing defendant, Deputy Ochoa recovered the items defendant had discarded—a small plastic baggie containing a crystalline substance and an eyeglass case holding a hypodermic needle.  A laboratory test determined the crystalline substance in the baggie was 1.55 grams of methamphetamine.

B.  *Defense Evidence*

Defendant testified he had been arguing with his girlfriend all day at her house on September 3, 2012.  As she was driving him home, they continued to argue in the car.  He asked her to pull over so he could get his bike from the trunk and ride it the rest of the way home.  When she pulled over onto a dirt road, he got out and walked to the trunk. He unhooked a bungee cord and opened the trunk.

As he began gathering his backpack and extra clothing, his girlfriend told him the police were there.  He did not believe her until he heard a voice asking, "What are you guys doing?"  He walked towards the rear light of the driver's side and observed Deputy Ochoa searching his girlfriend.  He did not hear his girlfriend consent to the patdown.

4

Deputy Ochoa then noticed defendant and told him, "Hey, get out of the trunk." As the deputy continued to search his girlfriend, defendant walked back to the trunk to hook the bungee cord onto the trunk because he believed the deputy was going to let them leave.

Defendant saw the bungee cord on the ground and was going to pick it up when Deputy Ochoa asked him whether he was on probation or parole. He did not respond, and instead reached inside his pocket to pull out his eyeglass case. He remembered he had a syringe inside the case and wanted to get rid of it because he was on probation.

As he placed his hand inside his pocket, Deputy Ochoa hit him in the back of his head, knocking him to the ground. The deputy placed his knee on defendant's lower back, continued to punch him in the head and back area, and ordered him to show his hands. Defendant denied he ever swung at the deputy. The deputy repeatedly commanded defendant to show his hands, but his hands were underneath his body and he was trying to remove his eyeglass case from his pocket. Defendant lost consciousness for a few seconds, then the deputy shot him with a Taser. Defendant admitted the eyeglass case with the syringe in it belonged to him, but denied the plastic baggie containing methamphetamine was his or that he dropped it on the ground.

C. *Motion for Acquittal*

At the close of the evidence, including the defense case, defendant made a motion for acquittal (§ 1118.1) on the forcibly resisting arrest charge, claiming there was insufficient evidence to support it because no reasonable jury could believe Deputy Ochoa did not use excessive force in arresting defendant. The claim was based on

5

claimed inconsistencies in Deputy Ochoa's testimony regarding how many times defendant attempted to strike him, and how many times he struck defendant. Based on the inconsistencies in the deputy's testimony, defense counsel argued no reasonable jury could believe he did not use excessive force.

The court deemed the motion timely.**4** Without considering any defense evidence, the court found the prosecution presented substantial evidence to support each element of the offense and denied the motion. The court found Deputy Ochoa credible and noted any inconsistencies in his testimony were subject to cross-examination and did not undermine his testimony supporting the charge. The jury subsequently found defendant guilty as charged of forcibly resisting an officer (Pen. Code, § 69) and possessing methamphetamine (Health & Saf. Code, § 11377, subd. (a)).

### III. DISCUSSION

A. *The Motion for Acquittal Was Properly Denied*

Defendant claims his motion for acquittal (§ 1118.1) on the charge of forcibly resisting arrest (§ 69) was erroneously denied because the prosecution presented insufficient evidence that Deputy Ochoa was performing his duties in a lawful manner *when he asked defendant whether he was on probation or parole*. Defendant argues Deputy Ochoa used an accusatory tone in asking defendant whether he was on probation

---

**4** The prosecutor agreed the motion could be deemed timely because defense counsel made the motion at sidebar at the close of the prosecution's case.

6

or parole, and this indicated to a reasonable person in defendant's position that defendant was not free to end the encounter with the deputy, and leave.[5]

We conclude the motion was properly denied. Through the testimony of Deputy Ochoa, the prosecution made a prima facie showing that defendant was not being detained, and was free to end the encounter and leave, when Deputy Ochoa asked defendant whether he was on probation or parole.

1. Standard of Review

"'"The standard applied by a trial court in ruling upon a motion for judgment of acquittal pursuant to section 1118.1 is the same as the standard applied by an appellate court in reviewing the sufficiency of the evidence to support a conviction, that is, 'whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged.'" [Citation.] "The purpose of a motion under section 1118.1 is to weed out as soon as possible those few instances in which the prosecution fails to make even a prima facie case." [Citations.] The question "is simply whether the prosecution has presented sufficient evidence to present the matter to the jury for its determination." [Citation.]

---

[5] This was not the basis of the motion for acquittal. (§ 1181.1.) Indeed, whether the deputy used an accusatory tone and therefore unlawfully detained defendant in asking him whether he was on probation or parole was never raised below. And as indicated, in moving for acquittal on the forcibly resisting arrest charge, the defense argued Deputy Ochoa was not performing his duties in a lawful manner because no reasonable juror could believe he did not use excessive force in arresting defendant, not because he unlawfully detained defendant by using an accusatory tone in asking defendant whether he was on probation or parole. The People do not claim the issue has been forfeited, and we exercise our discretion to consider it on its merits. (§ 1259.)

7

The sufficiency of the evidence is tested at the point the motion is made. [Citations.] The question is one of law, subject to independent review.' [Citation.]" (*People v. Maciel* (2013) 57 Cal.4th 482, 522.)

2. <u>Analysis</u>

"[S]ection 69 'sets forth two separate ways in which an offense can be committed. The first is attempting by threats or violence to deter or prevent an officer from performing a duty imposed by law; the second is resisting by force or violence an officer in the performance of his or her duty.'" (*People v. Smith* (2013) 57 Cal.4th 232, 240, quoting *In re Manuel G.* (1997) 16 Cal.4th 805, 814 (*Manuel G.*).) Here, we are concerned with forcibly resisting arrest, the second type of offense under section 69.

To prove a defendant forcibly resisted arrest, the prosecution must show the arresting officer was lawfully performing his duty when the resistance of force occurred. (*People v. Smith, supra,* 57 Cal.4th at p. 241, citing *Manuel G., supra,* 16 Cal.4th at p. 815 ["a defendant cannot be convicted of an offense against a peace officer '"*engaged in . . . the performance of . . .* [his or her] *duties*"'" unless the officer was acting lawfully at the time the offense against the officer was committed"].)

Unreasonable searches and seizures by state law enforcement officers are unlawful under the Fourth and Fourteenth Amendments. (U.S. Const., 4th & 14th Amends.; *Mapp v. Ohio* (1961) 367 U.S. 643, 655.) A person is seized within the meaning of the Fourth Amendment "when [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . ." (*Florida v. Bostick* (1991) 501 U.S.

429, 434 (*Bostick*).) Circumstances that might indicate a seizure include "the presence of several officers, an officer's display of a weapon, some physical touching of the person, or the use of language or of a tone of voice indicating that compliance with the officer's request might be compelled." (*Manuel G., supra,* 16 Cal.4th at p. 821.) Unless the officer has a reasonable suspicion—justified by specific and articulable facts—that a person has committed a crime or is about to commit a crime, the detention is unlawful. (*Terry v. Ohio* (1968) 392 U.S. 1, 21; *Manuel G., supra,* at p. 821.)

Unlike a detention, a consensual encounter between a law enforcement officer and a citizen does not trigger Fourth Amendment scrutiny. (*United States v. Mendenhall* (1980) 446 U.S. 544, 554.) It is well-established that an officer can approach an individual on a street or in another public place and converse with them—without any objective justification. (*Bostick, supra,* 501 U.S. at p. 434; *Wilson v. Superior Court* (1983) 34 Cal.3d 777, 784 (*Wilson*).) In determining whether a consensual encounter rises to the level of a detention, "a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." (*Bostick, supra,* at p. 439; *Manuel G., supra,* 16 Cal.4th at p. 821.)

Defendant claims Deputy Ochoa's question about his probation or parole status was so accusatory in tone that a reasonable person in defendant's position would not have felt free to terminate the encounter. To be sure, it is well-settled that "the use of language

9

or tone of voice" might indicate to a defendant that "compliance with the officer's request might be compelled." (*United States v. Mendenhall, supra,* 446 U.S. at p. 554; *Manuel G., supra,* 16 Cal.4th at p. 821.) Hence, questions that are sufficiently accusatory in nature can constitute a coercive show of police authority, transforming an encounter into a detention. (See *Wilson, supra,* 34 Cal.3d at pp. 790-791.)

In *Wilson*, an undercover officer was monitoring incoming flights at the Los Angeles International Airport for the illegal transportation of narcotics. (*Wilson, supra,* 34 Cal.3d at p. 780.) During his surveillance, the officer noticed Wilson arriving from a flight from Miami. (*Ibid.*) The officer followed Wilson through the terminal and approached him as he stood next to his car parked at the curb. (*Id.* at pp. 780-781.) After identifying himself as a police officer, he informed Wilson that he was conducting an investigation and had received information that Wilson would be "'*carrying a lot of drugs.*'" (*Id.* at p. 781.) The court concluded that Wilson was detained at that point, because "in such a situation, an ordinary citizen, confronted by a narcotics agent who has just told him that he has information that the citizen is carrying a lot of drugs, would not feel at liberty simply to walk away from the officer. (*Id.* at p. 790.)

The *Wilson* court reasoned: "Before [the officer] made that statement, Wilson might well have thought that the officer was simply pursuing routine, general investigatory activities, and might reasonably have felt free to explain to the officer that he . . . did not have the time—or, perhaps, the inclination—to answer the officer's questions or to comply with his request for permission to search. [But] [o]nce the officer

10

advised Wilson that he had information that Wilson was carrying a lot of drugs, the entire complexion of the encounter changed and Wilson could not help but understand that at that point he was the focus of the officer's particularized suspicion." (*Wilson, supra,* 34 Cal.3d at pp. 790-791.)

The present case is distinguishable from *Wilson*, where the officer specifically accused Wilson of transporting a large amount of narcotics. (*Wilson, supra,* 34 Cal.3d at pp. 780-781.) Unlike the officer in *Wilson*, Deputy Ochoa did not do anything to convey to defendant that he was the focus of any particularized suspicion or that he was not free to leave. Deputy Ochoa was not attempting to uncover any specific criminal conduct. Nor did he accuse defendant of committing a crime. Rather, he simply asked defendant whether he was on probation or parole. Though defendant argues the question was accusatory in nature and tone, a question about a defendant's probation or parole status does not transform an encounter into a detention without a showing the deputy exhibited physical force or coercive police authority. (See *California v. Hodari D.* (1991) 499 U.S. 621, 625-626.)

Viewed in the light most favorable to the prosecution, the evidence at the close of the prosecution's case-in-chief depicted what began as a consensual encounter between Deputy Ochoa and defendant. This was not a traffic stop. Deputy Ochoa noticed a car parked on the side of a rural road with defendant and his girlfriend standing alongside it. He parked his patrol vehicle parallel to the car, and did not block their path with his vehicle or activate his lights or siren. His approach toward defendant's girlfriend was not

11

rushed or hurried. He said something to the effect of, "how is it going, what's going on," and then asked her consent to conduct a patdown search of her for weapons.

Though defendant argues the patdown search of his girlfriend demonstrated a show of authority over defendant, there is no evidence to suggest any coercive conduct accompanied the patdown. Deputy Ochoa did not draw any weapons nor was he accompanied by other officers. In addition, defendant's freedom of movement was never restrained during the patdown of his girlfriend. While Deputy Ochoa was patting down the girlfriend on the driver's side of the car, defendant walked from the passenger side to the trunk. Then, when Deputy Ochoa followed defendant to the rear of the car, defendant opened the trunk. These movements indicate Deputy Ochoa made no show of physical force or show of authority restraining defendant's liberty.

Deputy Ochoa testified that after defendant walked to the rear of the car and opened the trunk, he became nervous for his safety and at that point asked defendant whether he was on probation or parole. United States Supreme Court cases "make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free 'to disregard the police and go about his business,' [citation], the encounter is consensual and no reasonable suspicion is required. . . . 'Only when the officer, by means of physical force or a show of authority, has in some way restrained the liberty of a [person] may we conclude that a "seizure" has occurred.'" (*Bostick, supra,* 501 U.S. at p. 434.) "[A]s long as the police do not convey a message that compliance with their requests is

12

required," the encounter does not implicate the Fourth Amendment. (*Bostick, supra,* at p. 435.)

Nor does police questioning, unaccompanied by a show of physical or verbal force, constitute an involuntary detention, even if the questioning concerns the person's probation or parole status. (*People v. Bennett* (1998) 68 Cal.App.4th 396, 401-402 (*Bennett*).) Indeed, police officers may approach individuals whom they have no reason to suspect of having committed or are committing a crime, and ask them potentially incriminating questions. (*Bostick, supra,* 501 U.S. at p. 439; see *I.N.S. v. Delgado* (1984) 466 U.S. 210, 216 ["interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure."].)

The present case resembles the "classic consensual encounter" found in *Bennett*. (*Bennett, supra,* 68 Cal.App.4th at p. 401.) In *Bennett*, an officer noticed the defendant speaking with a prostitute and approached him, asking, "'Can I talk to you for a moment?'" to which Bennett replied, "'Yes.'" (*Id.* at p. 399.) The officer remembered Bennett from a previous contact and asked him if he was still on parole. (*Ibid.*) When Bennett replied he was, the officer asked him if he would be willing to wait while he ran his name for warrants, to which the defendant again replied, "'Yes.'" (*Ibid.*) When the warrant check revealed Bennett had violated parole, he was placed under arrest. (*Ibid.*) The Court of Appeal held the officer's initial contact was a "classic consensual encounter" which did not implicate the Fourth Amendment because "nothing was done to restrain Bennett's liberty in any way." (*Bennett, supra,* at pp. 402-403.) The tone of the

13

conversation was calm, and Bennett was cooperative: "No physical force was required or threatened; no handcuffs or other restraints were applied." (*Id*. at p. 399.)

Similarly here, Deputy Ochoa did not use any words, gestures, or other coercive conduct to detain defendant before asking him if he was on probation or parole: there was no shouting, no use or display of any weapons, and no physical restraint of defendant. Deputy Ochoa did not run towards defendant, block his path, or demand that he do anything. Simply put, Deputy Ochoa did nothing more than ask defendant whether he was on probation or parole. Hence, up to this point, a reasonable person in defendant's position would have believed Deputy Ochoa was "simply pursuing routine, general investigatory activities" (*Wilson, supra,* 34 Cal.3d at p. 790), and like the defendant in *Bennett*, defendant was not obligated to answer the deputy's question and was free to terminate the consensual encounter.

Defendant urges a contrary conclusion. He relies on *People v. Garry* (2007) 156 Cal.App.4th 1100, where a uniformed officer was patrolling a high crime area around midnight when he noticed the defendant standing next to a parked car. (*Id*. at pp. 1103-1104.) The officer turned on his patrol car's spotlight, emitting a white light and illuminating Garry. (*Id*. at p. 1104.) The officer then exited his vehicle and walked briskly towards Garry. Looking nervous, Garry began walking backwards and stated, ""'I live right there,"'" pointing to a nearby house. The officer continued to walk towards Garry saying, "'Okay, I just want to confirm that,'" and then asked him if he was on probation or parole. (*Ibid*.)

14

The Court of Appeal in *Garry* concluded the officer's actions, taken as a whole, constituted a detention. (*People v. Garry, supra,* 156 Cal.App.4th at p. 1111.) In so concluding, the court emphasized the importance of an officer's "words and verbal tones," "how the officers physically approach[] their subjects," and whether the use of the spotlight constituted a "show of authority." (*Id.* at pp. 1110-1112.) The officer "bathed defendant in light, exited his police vehicle, and, armed and in uniform, 'briskly' walked 35 feet in 'two and a half, three seconds' directly to [the defendant] while questioning him about his legal status." (*Id.* at p. 1111.) In light of these circumstances, the officer's conduct "constituted a show of authority so intimidating as to communicate to any reasonable person that he or she was '"not free to decline [his] requests or otherwise terminate the encounter."'" (*Id.* at p. 1112.)

The situation here is markedly different from *Garry*. There was nothing intimidating about Deputy Ochoa's method of approaching defendant. Unlike the officer in *Garry*, Deputy Ochoa did not shine a spotlight on defendant, nor did he "all but r[u]n directly at" defendant and immediately ask him if he was on probation or parole—facts the *Garry* court found dispositive in determining the initial encounter was a detention. (*People v. Garry, supra,* 156 Cal.App.4th at pp. 1111-1112.)

To the contrary, Deputy Ochoa initiated the contact with defendant's girlfriend by saying something to the effect of, "how is it going, what's going on." He was not accompanied by any other officers. Nor did he display his weapon or apply any physical force. Defendant nevertheless argues Deputy Ochoa displayed an even greater show of

15

authority than the officer in *Garry* because Deputy Ochoa conducted a patdown of his girlfriend and then, without seeking defendant's consent to have a conversation with him, immediately questioned defendant about his probation or parole status. But as explained, viewed in the light most favorable to the prosecution, the deputy's patdown of defendant's girlfriend was consensual. And the fact the deputy asked defendant about his legal status without requesting his consent to converse did not transform the encounter into a detention. "[I]t is generally understood that '"[t]here is nothing in the Constitution which prevents a police [officer] from addressing questions to anyone on the streets," . . .'" (*Bennett, supra,* 68 Cal.App.4th at pp. 401-402.)

Defendant also relies on a number of out-of-state cases involving circumstances in which accusatory questioning alone constituted a detention. In *J.G.*, a field inquiry was transformed into a detention when an officer asked the defendant "if there was 'anything on him that he shouldn't have.'" (*State ex rel. J.G.* (1999) 320 N.J. Super. 21, 31 [726 A.2d 948, 953].) Because the officer's inquiry presupposed criminal activity, the court found it effectuated an awareness in the defendant that "he was the subject of a particularized investigation." (*Ibid.*) In *Alverez*, a detention occurred when two officers waited for the defendant, approached him, then accused him of two illegal acts: drug trafficking and not having car insurance. (*State v. Alverez* (Utah 2006) 147 P.3d 425, 429-430.) The "accusatory nature of the questions and the context in which they were asked demonstrated a 'show of authority' sufficient to restrain [d]efendant's freedom of movement. [Citation.]" (*Id.* at p. 432.)

16

Similarly, in *Jason L.*, a detention occurred when two officers approached the defendant and his companion in their patrol vehicle, commanded them to come towards the officers, and asked them twice if they were armed. (*State v. Jason L.* (2000) 129 N.M. 119, 122 [2 P.3d 856, 859].) The court concluded a reasonable person in the defendant's position would not have felt free to leave after being asked a second time about weapons possession. (*Id*. at p. 863.) Lastly, in *Pitts*, the defendant was detained after two officers followed him for a substantial distance, searched his taxi, and then questioned him about possession of weapons and drugs. (*State v. Pitts* (2009) 186 Vt. 71, 74-75 [978 A.2d 14, 17-18].) The court explained: "[T]hese circumstances . . . are precisely the kind which courts have characterized as a particularized inquiry into criminal activity which the average person would not have felt free to disregard or terminate." (*Id*. at p. 22.)

These out-of-state cases are factually distinguishable from the present case and, in any event, not binding on this court. (See *Episcopal Church Cases* (2009) 45 Cal.4th 467, 490.) Each case involved circumstances in which an officer's questioning was accusatory in nature because the particularized inquiry presupposed the defendant was engaging in criminal activity. Indeed, as defendant recognizes, "courts throughout the country have ruled that a field inquiry becomes a *Terry* stop [i.e., a detention] upon 'unsupported outright accusations of criminal activity.' [Citations.]" (*State ex rel. J.G., supra,* 726 A.2d at p. 953.) But here, Deputy Ochoa did not accuse defendant of any crime; he asked defendant whether he was on probation or parole, and merely asking

17

whether a person is on probation or parole does not in and of itself constitute an "unsupported outright accusation of criminal activity" to convert the inquiry into a detention. (See *I.N.S. v. Delgado, supra,* 466 U.S. at p. 216; *Bostick, supra,* 501 U.S. at p. 434.)

Even if we were to assume, for the sake of argument, that Deputy Ochoa's inquiry about defendant's legal status constituted a show of authority, an officer's show of authority does not constitute a seizure under the Fourth Amendment if there has been no submission by the defendant to the officer's authority. (See *California v. Hodari D., supra,* 499 U.S. at pp. 625-626.) In *Hodari D.*, a group of youths were huddled around a car parked on a curb in a high crime area. (*Id.* at pp. 622-623.) When two officers approached the car, the group took flight. (*Ibid.*) One of the officers chased the defendant, who did not see the officer until the "officer was almost upon him, whereupon he tossed away what appeared to be a small rock. A moment later, [the officer] tackled Hodari, handcuffed him, and radioed for assistance." (*Id.* at p. 623.) The small rock was later determined to be crack cocaine. (*Ibid.*) The high court held Hodari had not been seized within the meaning of the Fourth Amendment because he had not submitted to the officer's show of authority at the time he tossed the drug. The court reasoned that a seizure for purposes of the Fourth Amendment "requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority." (*California v. Hodari D., supra,* at p. 626.) Thus, a mere showing of police authority is not enough to constitute a seizure—absent any use of physical force by the officer or submission to the assertion of

18

authority by the defendant.  (*Id.* at pp. 626-627.)  Accordingly, until Hodari submitted, that is, until he was tackled by the officer, no seizure occurred.  (*Id.* at p. 629.)

Here, defendant did not answer Deputy Ochoa's question regarding his probation or parole status.  Instead, he ran, and did not submit to the officer's show of authority, if any.  Defendant's refusal to respond to Deputy Ochoa's question precludes a finding he was detained.  (See *California v. Hodari D., supra,* 499 U.S. at p. 626 [noting that "a policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee" has not been seized under the Fourth Amendment].)  However, once defendant started running and reaching for his waistband, reasonable suspicion arose to detain defendant.

Viewing Deputy Ochoa's conduct as a whole and in the light most favorable to the trial court's denial of the motion for acquittal, the prosecution's evidence was sufficient to show Deputy Ochoa did not unlawfully detain defendant, and performing his duties in a lawful manner, when he asked defendant whether he was on probation or parole.

B.  *Substantial Evidence Supports Defendant's Forcibly Resisting Arrest Conviction*

In a second argument related to his first, defendant claims his due process rights have been violated because insufficient evidence supports his conviction for forcibly resisting arrest.  Again, he argues there is insufficient evidence that Deputy Ochoa was lawfully performing his duties when he arrested defendant because he unlawfully detained defendant when he asked him whether he was on probation or parole.

In reviewing a challenge to the sufficiency of the evidence supporting a criminal conviction, we review the record "in the light most favorable to the judgment below to

19

determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) "'[W]e presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence.'" (*People v. Wilson* (2008) 44 Cal.4th 758, 806.) "If the circumstances reasonably justify the trier of fact's findings," a reversal is not warranted despite the fact that circumstances may reasonably support a contrary finding. (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)

Though defendant's version of the events supports a different conclusion, this does not detract from the sufficiency of the evidence supporting the conviction. The jury was entitled to believe Deputy Ochoa's version of events, rather than defendant's, and the deputy's testimony supported a reasonable inference that defendant was not detained when the deputy approached him and asked him whether he was on probation or parole. Indeed, defendant did not dispute that he failed to respond when the deputy asked him whether he was on probation or parole. Once defendant refused to answer the deputy's question whether he was on probation or parole, then ran past the deputy and reached for his waistband, the deputy was justified in detaining defendant based on reasonable suspicion of criminal activity.

## IV. DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

20

KING
J.

We concur:

RAMIREZ
P. J.

RICHLI
J.

21