**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1070-19

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

JUAN R. RUIZ-MONTANO,
a/k/a JUAN R. RUIZ, and
JUAN R. MONTANO,

      Defendant-Appellant.

_____

Argued November 15, 2021 – Decided January 7, 2022

Before Judges Fasciale and Vernoia.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 18-03-0039.

Peter T. Blum, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Peter T. Blum, of counsel and on the briefs).

Steven A. Yomtov, Deputy Attorney General, argued the cause for respondent (Andrew J. Bruck, Acting Attorney General, attorney; Steven A. Yomtov, of counsel and on the brief).

PER CURIAM

Defendant Juan R. Ruiz-Montano appeals from an order denying his motion to suppress evidence seized from his motor vehicle. He contends the court erred by denying the suppression motion without first conducting an evidentiary hearing. He claims an evidentiary hearing was required because there is a fact issue as to whether the detectives who conducted the motor vehicle stop that led to the seizure of the evidence had sufficient information to support a reasonable and articulable suspicion he had been, or was, engaged in criminal activity when his vehicle was stopped. Unpersuaded by defendant's arguments, we affirm.

I.

On December 12, 2017, detectives from the New Jersey Division of Criminal Justice (DCJ) conducted a stop of defendant's vehicle. The detectives detained defendant and later obtained a search warrant for the vehicle. A subsequent search of the vehicle revealed a hidden compartment in the center console containing approximately six kilograms of cocaine, a scale, and $4,500 in cash.

A-1070-19

A grand jury indicted defendant and eight co-defendants with numerous controlled dangerous substance (CDS) and other offenses.[1]  The co-defendants included Jeffrey Jaquez, Luis Peguero-Nin, Adrian Mena-Acevedo, Jose Encarnacion, Juan Duran, Emily Aracena-Freijomil, Chamil Polanco, and John Doe a.k.a. "Gingo."

Defendant moved to suppress the evidence recovered from his vehicle.  In part, he claimed the warrantless motor vehicle stop and his subsequent detention while the State applied for the search warrant were unconstitutional because the detectives lacked "reasonable suspicion or probable cause" to believe he committed an offense.

Because defendant's suppression motion challenged the warrantless stop of his motor vehicle, our Rules of Court required that the State first "file a brief, including a statement of the facts as it allege[d] them to be," R. 3:5-7(b), supporting the stop.  The State filed two briefs setting forth its version of the

---

[1]  The grand jury charged defendant in the following five counts of the thirty-seven-count indictment:  second-degree conspiracy to distribute CDS, cocaine, N.J.S.A. 2C:35-5(a)(1), (b)(1), and (c), and N.J.S.A. 2C:5-2 (count one); first-degree possession with intent to distribute CDS, cocaine, N.J.S.A. 2C:35-5(a)(1), (b)(1) (count sixteen); third-degree possession of CDS, cocaine, N.J.S.A. 2C:35-10(a)(1) and N.J.S.A. 2C:2-6 (count eighteen); third-degree possession with intent to distribute CDS, cocaine, on or within 1,000 feet of school property, N.J.S.A. 2C:35-7 and N.J.S.A. 2C:2-6 (count nineteen); and third-degree money laundering, N.J.S.A. 2C:21-25(a) (count twenty).

A-1070-19

facts, and, in accordance with Rule 3:5-7(b), defendant filed letter briefs in response to each. Based on our review of the parties' briefs, we discern that the following facts were presented to the motion court for its consideration of the suppression motion.[2]

In June 2017, a cooperating witness informed the DCJ that Jaquez was distributing cocaine in Paterson. Between July and November 2017, the cooperating witness made six controlled purchases of cocaine from Jaquez. Based on information obtained pursuant to a court authorized wiretap of Jaquez's phone number, as well as surveillance, DCJ detectives identified Peguero-Nin as Jaquez's cocaine supplier.

Information from a wiretap of Peguero-Nin's phone number and additional surveillance resulted in the DCJ detectives' identification of Polanco and Ricardo Burgos-Polanco as employees of Peguero-Nin's drug distribution operation. DCJ detectives further identified Mena-Acevedo as Peguero-Nin's

---

[2] The State detailed numerous facts in its initial February 7, 2019 letter brief filed in response to defendant's suppression motion. Defendant's February 26, 2019 opposition letter brief did not dispute any of the facts relied on by the State in support of the motor vehicle stop. In its March 6, 2019 letter reply brief, the State provided additional facts it alleged occurred prior to the motor vehicle stop, including those set forth in the search warrant affidavit, which the State attached to its brief. Defendant's final brief, dated March 27, 2019, did not contest any of the facts the State described concerning the motor vehicle stop that were set forth in the State's two briefs and the search warrant affidavit.

cocaine supplier, and a trial court order authorized a wiretap for Mena-Acevedo's phone number. Based on surveillance and wiretapped calls, DCJ detectives identified Mena-Acevedo's girlfriend, Aracena-Freijomil, and Juan Duran as employees of Mena-Acevedo's operation. Detectives also identified Encarnacion as Mena-Acevedo's cocaine supplier and defendant as Encarnacion's associate. Encarnacion resides on Union Avenue in Paterson.

On December 6, 2017, Encarnacion received a phone call from an unidentified person.[3] Based on his training, experience, and the investigation, DCJ Detective Sergeant Patrick Sole believed Encarnacion and the unidentified person discussed a narcotics transaction. Specifically, Sole believed the unidentified person advised Encarnacion he needed to bring more cocaine because the unidentified person diluted it too much during the cutting process. Sole further believed, based on his training and experience, that during two additional calls between Encarnacion and the unidentified person, the unidentified person cut cocaine for Encarnacion and told Encarnacion to pick it up because it was finished.

---

[3] In the affidavit in support of the search warrant, Encarnacion is referred to as "Lapiz."

A-1070-19

During surveillance of Encarnacion on December 6, 2017, DCJ detectives observed Encarnacion meet with an individual later identified as defendant, who was observed driving a black Honda Pilot in front of Encarnacion's Union Avenue apartment. After meeting with defendant, Encarnacion walked into the garage for approximately one minute, then he walked back to defendant's vehicle and leaned into the vehicle's passenger side. Based on his training and experience, Sole believed Encarnacion gave defendant either money or narcotics, which Encarnacion had retrieved from the garage.

On December 8, 2017, DCJ detectives observed defendant in the black Honda Pilot and Encarnacion, who was driving a Honda Accord, arrive at the Union Avenue apartment. The two men then entered the apartment. Approximately three hours later, Encarnacion and defendant exited the apartment and stopped in front of the house before walking across the street. Approximately five minutes later, they walked back across the street to the apartment, and Encarnacion went into the garage for approximately one minute. Encarnacion left the garage, walked to defendant's vehicle with a white item in his hand, and met with defendant. Defendant then left in the black Honda Pilot.

Based on his training, experience, and the investigation, Sole believed defendant helped Encarnacion transport cocaine to the Union Avenue apartment,

6

and that when Encarnacion gave defendant a white package from the garage, he paid defendant for helping with the transportation.

At approximately 12:54 p.m. on December 12, 2017, DCJ detectives observed defendant arrive at Encarnacion's Union Avenue apartment in the black Honda Pilot. After briefly waiting outside, defendant entered the apartment. At approximately 2:13 p.m., defendant left the apartment "carrying a red and black duffel bag" that "appeared full and weighted."

Defendant walked to the black Honda Pilot, entered the front passenger side with the duffel bag, and then, after a few minutes, exited the vehicle carrying a small white plastic bag, which he brought to, and placed under, a stairwell. Defendant left the small bag under the stairwell, returned to his vehicle, and departed. Encarnacion was observed watching defendant from his apartment the entire time. DCJ Sergeant Mario Estrada followed defendant's vehicle as it departed the Union Avenue apartment and conducted the investigatory stop of the vehicle two minutes later, at approximately 2:15 p.m.

As the State detailed in its initial brief in opposition to defendant's suppression motion, defendant's December 6 and 8, 2017 meetings with Encarnacion, "as well as the events of December 12, 2017, were suspected by [DCJ] detectives to be CDS transactions based on the [DCJ] investigation and

their training and experience. As such, detectives [including Estrada] conducted" the stop "to investigate the suspected criminal activity." The State further asserted that "[b]ased on the totality of the circumstances, including the observations on December 12 and earlier in the investigation, the detectives had a reasonable and particularized suspicion to believe that [defendant] was engag[ed] in illegal activity . . . at the time of the investigatory stop."

Following the stop, the DCJ detectives advised defendant he was stopped as part of the drug investigation. Defendant gave the detectives his license, insurance, and registration. Detectives requested that defendant show them the contents of the duffel bag, which contained a shirt and no other items.

During their investigation, detectives observed that other members involved in the drug trafficking organization, including Jaquez, had hidden compartments, or "traps," in their vehicles to hide contraband. Estrada asked defendant if his vehicle had any hidden compartments. Defendant replied, "If there is, I don't know about it."

The DCJ detectives detained defendant; they removed him from his vehicle and placed him into the rear of a police vehicle. At approximately 3:03 p.m., a canine unit arrived at the scene, and conducted a canine drug sniff around the outside of defendant's vehicle with negative results.

The DCJ detectives continued defendant's detention. They transported him, and towed his vehicle, to a police station. At approximately 7:30 p.m., detectives obtained a search warrant for defendant's black Honda Pilot. As noted, the subsequent search of the vehicle resulted in the seizure of cocaine, a scale, and cash from the hidden compartment in the center console.

In his letter briefs to the court, defendant argued the detectives lacked a reasonable and articulable suspicion of criminal activity supporting the motor vehicle stop. He claimed the detectives stopped his vehicle on nothing more than a "hunch" that it contained CDS, and, for that reason, the motor vehicle stop was unconstitutional. Defendant further claimed his subsequent detention while the DCJ detectives sought and obtained the search warrant was unconstitutional because it constituted a de facto arrest unsupported by probable cause he had committed any offense.

The court heard argument on defendant's motion. Defendant's counsel claimed the detectives did not have a reasonable and articulable suspicion supporting the stop of defendant's vehicle and the subsequent detention of defendant because they did not observe a motor vehicle violation; defendant had his license, registration, and insurance; the duffel bag did not contain any contraband; detectives did not discover contraband after initially searching the

vehicle for weapons; and the canine sniff was negative. Defendant further argued the seized evidence should be suppressed as fruit of the poisonous tree because the motor vehicle stop and his subsequent detention were unlawful. Defendant also argued he was entitled to an evidentiary hearing, but he did not identify any issues of fact based on the briefs submitted to the motion court.

The State argued the DCJ detectives lawfully stopped defendant's vehicle because they had reasonable suspicion he was committing an offense based on their ongoing investigation, including their previous surveillance of defendant's activities and their observations of defendant and Encarnacion on December 12, 2017. The State also argued that detectives' search of the duffel bag, which yielded only a t-shirt from a bag that had been "full and weighted" when brought to the vehicle, as well as other information concerning the use of hidden vehicle compartments by others who were the subject of the investigation, further supported probable cause defendant possessed contraband in the vehicle. The State further asserted that even if defendant's detention was a de facto arrest, the probable cause to search defendant's vehicle also supported probable cause to believe defendant was engaged in illegal activities. The State asserted an evidentiary hearing was not necessary because there were no material factual disputes.

10

The court denied defendant's suppression motion. The court found the DCJ's ongoing investigation supported a reasonable belief Encarnacion was a cocaine supplier and defendant was his associate. The court also found that on December 6 and 8, 2017, DCJ detectives observed defendant arrive at Encarnacion's apartment in the black Honda Pilot, and, on both occasions, Encarnacion briefly entered his garage before returning to defendant and handing him something. The court determined that on December 12, 2017, DCJ detectives observed defendant arrive at Encarnacion's apartment and later leave with a red and black duffel bag, which appeared full and weighted.

The court found the detectives conducted an investigatory stop of the black Honda Pilot, advised defendant they stopped him as part of a drug investigation, and requested to search the duffel bag, which contained only a shirt. The court also found the detectives asked defendant whether the vehicle had hidden compartments, and defendant denied having knowledge of any. The court determined the DCJ detectives removed defendant from his vehicle and placed him into the rear of a police vehicle.

The court further determined the detectives transported defendant and his vehicle to a police station around 6:20 p.m., obtained a search warrant, and the

11

search revealed contraband in a hidden compartment in the center console of defendant's vehicle.

The court concluded an evidentiary hearing was unnecessary because defendant did not dispute any material fact set forth in the State's letter briefs. The court held the motor vehicle stop was lawful because detectives had a reasonable and articulable suspicion, based on their observations during the investigation and on December 12, 2017, that defendant was engaged in the illegal activity of transporting drugs.

The court found a de facto arrest occurred because the detectives detained defendant and transported him to a police station. The court found the arrest lawful because the detectives had probable cause to believe defendant was engaged in illegal activities. The court concluded the search of defendant's vehicle was lawful, and it entered an order denying defendant's suppression motion.

Defendant pleaded guilty to first-degree possession with intent to distribute a controlled dangerous substance and the court imposed a sentence in accordance with the plea agreement. Defendant appeals from his judgment of conviction and the order denying his suppression motion.

Defendant presents the following argument for our consideration:

12

<u>POINT ONE</u>

AN EVIDENTIARY HEARING SHOULD HAVE BEEN HELD ON THE LEGALITY OF THE INVESTIGATIVE DETENTION AND SUBSEQUENT ARREST BECAUSE THE ATTORNEY GENERAL'S PAPERS FAILED TO ALLEGE WHAT INFORMATION THE DECISION-MAKING DETECTIVE(S) HAD RELIED UPON AT THE TIME. <u>U.S. CONST.</u> AMEND. IV, XIV; <u>N.J. CONST.</u> ART. I, PARA. 1, 7.

II.

The Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution guarantee "[t]he right of the people to be secure . . . against unreasonable searches and seizures." <u>U.S. Const.</u> amend. IV; <u>N.J. Const.</u> art. I, ¶ 7. "Because warrantless . . . searches are presumptively invalid, the State bears the burden of establishing that any such . . . search is justified by one of the '"well-delineated exceptions" to the warrant requirement.'" <u>State v. Shaw</u>, 213 N.J. 398, 409 (2012) (quoting <u>State v. Frankel</u>, 179 N.J. 586, 598 (2004)). The State must prove the validity of a warrantless search by a preponderance of the evidence. <u>Ibid.</u> Where an officer obtains "physical, tangible materials . . . during or as a direct result of an unlawful invasion," the exclusionary rule applies and will bar such materials

13

from trial.  Wong Sun v. United States, 371 U.S. 471, 485 (1963); see also Shaw, 213 N.J. at 412-13.

A motor vehicle stop constitutes a "seizure" under the United States and New Jersey Constitutions.  State v. Scriven, 226 N.J. 20, 33 (2016).  To justify a motor vehicle stop, "a police officer must have a reasonable and articulable suspicion that the driver of a vehicle, or its occupants, is committing a motor-vehicle violation or a criminal or disorderly persons offense."  Id. at 33-34; see also State v. Atwood, 232 N.J. 433, 444 (2018).  "The State bears the burden of proving that an investigatory stop is valid."  Atwood, 232 N.J. at 444.

"[R]easonable suspicion is neither easily defined nor 'readily, or even usefully, reduced to a neat set of legal rules.'"  State v. Stovall, 170 N.J. 346, 356 (2002) (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)).  The application of the reasonable suspicion standard is "highly fact sensitive."  State v. Nishina, 175 N.J. 502, 511 (2003).  "Facts that might seem innocent when viewed in isolation can sustain a finding of reasonable suspicion when considered in the aggregate . . . ."  Ibid.  Thus, to determine whether an officer had a reasonable and articulable suspicion, a court must consider the totality of the circumstances from the standard of an objectively reasonable police officer.  Stovall, 170 N.J. at 357, 361.

14

"No mathematical formula exists for deciding whether the totality of circumstances provided the officer with an articulable or particularized suspicion that the individual in question was involved in criminal activity." Id. at 361 (quoting State v. Davis, 104 N.J. 490, 505 (1986)). In determining whether the officer had a reasonable and articulable suspicion, a court may "consider[] the officers' background and training, and permit[] them 'to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person."'" State v. Nelson, 237 N.J. 540, 555 (2019) (quoting United States v. Arvizu, 534 U.S. 266, 273, (2002)). However, before a court will find that an officer had a reasonable and articulable suspicion, that "officer must 'be able to articulate something more than an "inchoate and unparticularized suspicion or hunch."'" Stovall, 170 N.J. at 357 (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)).

Additionally, the facts an officer relies upon to form reasonable suspicion must be known to him or her at the time the officer stops or detains someone and not after the fact. See State v. Robinson, 441 N.J. Super. 33, 46 (App. Div. 2015) (quoting State v. Bruzzese, 94 N.J. 210, 221 (1983)); see also State v. Patterson, 270 N.J. Super. 550, 561 (Law Div. 1993). "[W]here police officers

15

are cooperating in the same investigation, the knowledge of one is presumed shared by all." State v. Ford, 278 N.J. Super. 351, 356 (App. Div. 1995); see also United States v. Belle, 593 F.2d 487, 497 n.15 (3d Cir. 1979) ("The collective knowledge of the investigating officers is measured in determining probable cause."); Wood v. Crouse, 436 F.2d 1077, 1078 (10th Cir. 1971) (same).

Here, defendant argues the motion court erred by deciding his suppression motion without conducting an evidentiary hearing. He contends the facts presented by the State in support of the DCJ's warrantless stop of his vehicle did not establish the detectives who stopped his vehicle possessed information supporting a reasonable and articulable suspicion he was engaged in criminal activity. Defendant argues the State justified the stop based on a post hoc aggregation of information establishing the requisite suspicion for the stop. He asserts the stop was unconstitutional because the State's proffered facts did not establish the detectives who stopped the vehicle were aware of the aggregated information and, as a result, the State's facts failed to establish those detectives had a reasonable and articulable suspicion supporting the stop. Defendant claims the motion court should have conducted an evidentiary hearing to consider what the DCJ detectives who either ordered or conducted the stop

16

actually knew prior to the stop; defendant asserts that information is required to determine if the detectives had a reasonable and articulable suspicion of criminal activity permitting the stop. We are not persuaded.

We review a trial judge's denial of an evidentiary hearing for an abuse of discretion. State v. Broom-Smith, 406 N.J. Super. 228, 239 (App. Div. 2009). A court abuses its discretion when its "decision [is] made without a rational explanation, inexplicably depart[s] from established policies, or rest[s] on an impermissible basis." United States v. Scurry, 193 N.J. 492, 504 (2008) (citing Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

When a defendant moves to suppress evidence seized during a warrantless search, the State must "file a brief, including a statement of the facts as it alleges them to be," and the defendant must then "file a brief and counter statement of facts." R. 3:5-7(b). A court determines whether facts are in dispute based on a review of the briefs submitted. A court must hold an evidentiary hearing on a motion to suppress evidence only if material facts are in dispute. R. 3:5-7(c).

A defendant's counterstatement of facts must present "something more than the naked conclusion that the warrantless search was illegal, in order to obtain an evidentiary hearing pursuant to [Rule] 3:5-7(c)." State v. Hewins, 166 N.J. Super. 210, 215 (Law Div. 1979), aff'd, 178 N.J. Super. 360 (App. Div.

17

1981). "It is only when the defendant's counter statement places material facts in dispute that an evidentiary hearing is required." State v. Green, 346 N.J. Super. 87, 90-91 (App. Div. 2001) (citing Hewins, 166 N.J. Super. at 213-15); see also State v. Kim, 412 N.J. Super. 260, 268 (App. Div. 2010) (noting "a defendant must show there are material facts in dispute to be entitled to an evidentiary hearing" under Rule 3:5-7(c)).

Defendant argued before the motion court he was entitled to an evidentiary hearing, but he failed there, and also fails on appeal, to identify any pertinent facts asserted by the State in support of the motor vehicle stop that he contested or contests. In his written submissions to the motion court, defendant did not dispute any of the salient facts the State cited in support of the motor vehicle stop.[4] Having failed to contest any of the State's facts before the motion court,

---

[4] We are not persuaded by defendant's contention that he raised a fact issue as to whether he was a suspect prior to the motor vehicle stop. In support of his claim, defendant points to the statement in his February 26, 2019 brief that he "was not a target or a suspect" when the DCJ detectives made their observations of him with Encarnacion on December 12, 2017. Defendant's purported factual assertion, however, is not a statement of fact at all. It is a self-serving conclusory assertion for which defendant could not have any personal knowledge because he was not involved in the DCJ investigation. His declaration that he was not a suspect or target of an investigation about which he had no knowledge did not, and does not, create a factual issue concerning the DCJ's view of defendant—either as a suspect or target—prior to the December 12, 2017 motor vehicle stop. See State v. Kadonsky, 288 N.J. Super. 41, 46 (App.

and further failing to identify any disputes of fact on appeal, the record is bereft of a factual dispute warranting an evidentiary hearing. See id. at 90-91; see also Kim, 412 N.J. Super. at 268.

As we explained in Green, "[t]he mere allegation of a warrantless search, with the attendant burden of proof on the State to justify same, does not place material issues in dispute, nor does defendant's assertion that he denies the truth of the State's allegations." 346 N.J. Super. at 91 (citing Hewins, 166 N.J. Super. at 214). "In the absence of factual allegations to support the claim that the search and seizure were illegal, a hearing was not required . . . ." Kadonsky, 288 N.J. Super. at 46. We reject defendant's claims to the contrary.

Defendant argued before the motion court that the facts presented in the State's briefs did not establish a reasonable and articulable suspicion of criminal activity sufficient to support the motor vehicle stop. On appeal, defendant asserts a newly minted claim. He contends for the first time that even if the DCJ's investigation provided a sufficient basis supporting the motor vehicle

---

Div. 1996) (noting a "conclusory assertion" does not create a fact issue warranting an evidentiary hearing under Rule 3:5-7(c)); Hewins, 166 N.J. Super. at 215 (explaining under Rule 3:5-7(c) a defendant must present facts that "are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question" (quoting United States v. Ledesma, 499 F.2d 36, 39 (9th Cir. 1974))).

stop, the stop was unconstitutional because the facts proffered by the State to the motion court did not demonstrate that the detectives who effectuated the stop were personally aware of sufficient information permitting a reasonable and articulable suspicion by them that defendant was involved in criminal activity when the stop was made. Defendant does not argue he is entitled to an evidentiary based on any contested issues of fact; he claims he is entitled to a hearing to determine whether the DCJ detectives who stopped the vehicle, or the individuals who ordered the detectives to do so, personally had knowledge of facts supporting a reasonable and articulable suspicion defendant was engaged in criminal activity.

We reject defendant's argument for two separate but equally dispositive reasons. First, it was not raised before the motion court. "Generally, 'the points of divergence developed in proceedings before a trial court define the metes and bounds of appellate review.'" State v. Witt, 223 N.J. 409, 419 (2015) (quoting State v. Robinson, 200 N.J. 1, 19 (2009)); see also State v. Andujar, 462 N.J. Super. 537, 550 (App. Div. 2020). "Parties must make known their positions at the suppression hearing so that the trial court can rule on the issues before it," Witt, 223 N.J. at 419, and we "will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation

is available unless the questions raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest," Robinson, 200 N.J. at 20 (quoting Nieder v. Royal Indem. Ins., 62 N.J. 229, 234 (1973)).

These principles are especially applicable where, as here, defendant's failure "denied the State the opportunity to confront the claim head-on; it denied the [motion] court the opportunity to evaluate the claim in an informed and deliberate manner; and it denied [this] court the benefit of a robust record within which the claim could be considered." Id. at 21. As the Court explained in Witt, "it would be unfair, and contrary to our established rules, to decide the lawfulness of the stop when the State was deprived of the opportunity to establish a record [in accordance with Rule 3:5-7] that might have resolved the issue." 223 N.J. at 419. For that reason alone, we reject defendant's effort to challenge the motor vehicle stop based on his claim the record lacked evidence the detectives who stopped his vehicle did not have personal knowledge of the facts supporting a reasonable and articulable suspicion defendant was engaged in criminal activity; the argument was never made to the motion court.

The second reason we reject defendant's challenge to the motor vehicle stop is that it is not supported by the record. Defendant's argument is based on the premise that the facts set forth in the State's briefs did not permit the

conclusion that the DCJ detectives who conducted the stop had sufficient information providing a reasonable and articulable suspicion defendant was engaged in criminal activity when the stop occurred. We reject defendant's interpretation of the facts proffered by the State in its briefs to the motion court.

Defendant principally relies on United States v. Wilbourn, 799 F.3d. 900 (7th Cir. 2015), to support his argument. In Wilbourn, the Bureau of Alcohol, Tobacco and Firearms (ATF) conducted a two-year investigation of a Chicago drug distribution network allegedly headed by Rondell Freeman. Id. at 904-06. The ATF's two-year investigation included surveillance, wiretaps, information provided by informants, "garbage pulls," and audio and video recordings. Id. at 904. The government claimed its investigation showed the defendant was involved in a conspiracy with Freeman and others to distribute CDS. Ibid.

During the investigation, ATF agents observed a Dodge vehicle registered to the defendant's mother outside Freeman's resident. Id. at 905. ATF agents observed defendant and two other males enter the vehicle. Id. at 906. The agents surveilled the vehicle as it departed and later stopped at a gas station. Ibid.

While the Dodge was parked at the gas station, a Chicago police officer assisting in the ATF investigation observed a male exit a Buick vehicle, "approach the Dodge, and lean into the front passenger side," where the

individual "remained . . . for approximately ten seconds before returning to" the Buick. Ibid. The Buick then left the gas station. Ibid.

Several blocks from the gas station, two Chicago police officers stopped the Buick. Ibid. These two officers had no involvement in the ATF investigation. Ibid. Two females sat in the front of the Buick, and a male passenger, Adam Sanders, sat in the back seat. Ibid. The officers recognized Sanders, instructed him to exit the vehicle, and placed him in the rear of their police vehicle. Ibid. A search of the rear of the Buick disclosed 120 bags of crack cocaine packaged in a manner "associated with drugs sold by" the defendant. Ibid.

The United States District Court denied the defendant's motion to suppress the drugs found in the Buick, finding "the police officers had a reasonable suspicion to stop the Buick based on facts known to them as a result of the [ATF] investigation of the Freeman drug organization." Id. at 909. The Court of Appeals reversed, finding the facts presented in the government's brief supporting the warrantless vehicle stop did not establish that the "individual officers" who conducted the stop "knew anything about the persons inside the Buick at the time of the stop" or otherwise "had a reasonable suspicion that the persons in the Buick were engaged in criminal activity." Ibid.

23

The court noted the record describing the ATF's investigation "offered extensive evidence to establish that other officers had reason to suspect that the persons in the Buick had committed a crime," but the government "offered no evidence to suggest that anyone communicated any basis for those suspicions to" the two officers that actually stopped the vehicle. Ibid. Thus, the court determined these two officers were not "able to articulate any grounds to justify the stop," and the court concluded the stop was not supported by the requisite reasonable and articulable suspicion. Ibid.; see also id. at 909-10 (explaining "[t]he Fourth Amendment allows officers to 'stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity "may be afoot"'" (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989))).

Here, the State's briefs before the motion court proffered facts establishing circumstances different than those extant in Wilbourn. The State's briefs described the DCJ's ongoing investigation into the drug distribution operation, including the observations of defendant's interactions with Encarnacion on December 6 and 8, 2017, and the suspicious activity on December 12, when DCJ detectives observed defendant exit Encarnacion's apartment with a full and weighted duffel bag; enter the passenger side of his Honda Pilot for a few

moments; exit from the passenger side; deposit a small bag under a stairwell; and drive away after returning to the vehicle's driver's seat.

Unlike the two officers in <u>Wilbourn</u>, who stopped the Buick without any knowledge of the ATF's investigation, it can be reasonably inferred the DCJ detectives who stopped defendant in his Honda Pilot were fully aware defendant was suspected of involvement in the drug distribution operation the DCJ was investigating. As the State explained in its briefs to the motion court, and the search warrant affidavit it submitted to the court, defendant's interactions with Encarnacion on December 6, 8, and 12, 2017, which were surveilled by DCJ detectives, were "suspected by [DCJ] detectives to be [controlled dangerous substance] transactions based on the [DCJ] investigation and [the detectives'] training and experience." The State further represented that "[a]s such, [DCJ] detectives conducted a . . . stop of [defendant's] vehicle to investigate the suspected criminal activity." In other words, the State explained the DCJ's detectives suspected defendant was engaged in criminal activity based on their knowledge of the investigation, as well as their training and experience, and the detectives therefore conducted the motor vehicle stop.

The State's submissions to the motion court establish the DCJ detectives who stopped defendant's vehicle are wholly different from the officers in

Wilbourn, who did not have any knowledge the defendant was either being investigated by the ATF or was suspected of having committed any offense. According to the State's uncontradicted version of the facts, the detectives who stopped defendant's vehicle were directly involved in the DCJ's investigation and they suspected defendant's involvement in criminal activity based on surveillance of defendant and Encarnacion, and other information developed during the investigation.

The court in Wilbourn based its suppression of the evidence on the fact that the officers who stopped the car could not articulate the reason for the motor vehicle stop, but here the DCJ detectives explained the reason for the stop at the moment it occurred — they told defendant he was stopped as part of their "drug investigation." That reference made by the detectives immediately upon stopping defendant's vehicle could only logically be to the surveillance of defendant and other information developed during the DCJ's ongoing investigation of a drug distribution operation that included defendant. The officers in Wilbourn did not make a similar statement because, unlike the detectives here, they had no knowledge of the ATF's investigation, and they otherwise could not articulate any reason supporting the motor vehicle stop.

26

Additionally, as the State explained in its briefs and the search warrant affidavit supplied to the motion court, the DCJ detectives who stopped defendant were directly involved in the investigation and were present near Encarnacion's apartment on December 12, 2017. See, e.g., State v. Arthur, 149 N.J. 1, 4-5, 12 (1997) (upholding an investigatory stop of a vehicle when officers surveilling an area known for drug trafficking observed what they suspected was, based on their knowledge and experience, a drug transaction despite never encountering the occupants of the vehicle prior to that day). The State's briefs and the search warrant affidavit explained that the DCJ detectives who stopped defendant "followed" him after he left Encarnacion's apartment. The detectives could have only followed defendant from the apartment if they had been there in the first instance, participating in the investigation.

Thus, defendant's reliance on Wilbourn is misplaced. There, the two officers who stopped the vehicle had no knowledge of the ATF investigation, and they provided no reasonable and articulable suspicion for conducting the stop. Here, the State explained the DCJ detectives who stopped defendant were directly involved in the investigation, they suspected defendant's involvement in criminal activity based on the investigation, and they stopped defendant following the December 12, 2017 events at Encarnacion's apartment based on

27

that suspicion. The motion court's determination there was a reasonable and articulable suspicion defendant was engaged in criminal activity permitting the motor vehicle stop is amply supported by a fair reading of the facts the State proffered pursuant to Rule 3:5-7.

The State's presentation of the pertinent facts did not, as defendant contends, constitute a post hoc aggregation of facts that were unknown to the DCJ detectives prior to the motor vehicle stop. See Bruzzese, 94 N.J. at 221 (explaining a seizure must be supported by the facts extant and known at the time of the seizure); see also Patterson, 270 N.J. Super. at 561 (explaining facts learned by an officer who conducts a motor vehicle stop from another officer after the motor vehicle stop "cannot be subsequently combined" with facts known at the time of the stop "to justify the stop"). Although detailed generally, the State's proffered facts describe what was known to the DCJ detectives prior to the motor vehicle stop—defendants' interactions with suspected drug dealer Encarnacion that were consistent with drug transactions—and the facts established a reasonable and articulable basis to suspect defendant was engaged in criminal activity as he was followed from Encarnacion's apartment on December 12, 2017. Thus, based on the facts presented by the State, the DCJ detectives had a reasonable and articulable suspicion defendant was involved in

criminal activity prior to, and at the time of, the motor vehicle stop. See Bruzzese, 94 N.J. at 221. We therefore discern no basis to conclude the court erred by denying defendant's suppression motion without an evidentiary hearing.

Defendant also argues his lengthy detention by DCJ detectives following the motor vehicle stop, and while awaiting the issuance of the search warrant, constituted an unconstitutional de facto arrest. "An investigative stop becomes a de facto arrest when '"the officers" conduct is more intrusive than necessary for an investigative stop.'" State v. Dickey, 152 N.J. 468, 478 (1998) (quoting United States v. Jones, 759 F.2d 633, 636 (8th Cir. 1985)); see also State v. Shaw, 237 N.J. 588, 612-13 (2019) (detailing factors to be considered in determining whether an investigative stop has transformed into a de facto arrest).

A de facto arrest must be supported by probable cause to believe the defendant has committed or is committing an offense. State v. Coles, 218 N.J. 322, 346 (2014); see also Dickey, 152 N.J. at 478. "Probable cause" is a "practical, nontechnical conception" that is similarly "not readily, or even usefully, reduced to a neat set of legal rules." State v. Basil, 202 N.J. 570, 585 (2010) (quoting Gates, 462 U.S. at 231-32). It "'is more than a mere suspicion of guilt,' but 'less evidence than is needed to convict at trial.'" State v. Ingram,

29

230 N.J. 190, 213-14 (2017) (citations omitted) (first quoting Basil, 202 N.J. at 585; and then State v. Brown, 205 N.J. 133, 144 (2011)).  Officers must have a "well[-]grounded suspicion that a crime has been or is being committed," but that suspicion need not "be correct or more likely true than false."  State v. Johnson, 171 N.J. 192, 214-15 (2002) (citations omitted) (first quoting State v. Sullivan, 169 N.J. 204, 211 (2001); and then Bruzzese, 94 N.J. at 237).  "[I]n determining whether there was probable cause to make an arrest, a court must look to the totality of the circumstances and view those circumstances from the standpoint of an objectively reasonable police officer."  State v. Gibson, 218 N.J. 277, 293 (2014) (quoting Basil, 202 N.J. at 585).

The State does not dispute the investigatory stop of defendant and his vehicle became a de facto arrest after the detectives spoke to defendant following the motor vehicle stop and learned the duffel bag, that appeared fully filled and weighted when defendant carried it from Encarnacion's apartment, was completely empty, except for a shirt.  However, in our view, the same facts and information that supported the DCJ detectives' reasonable and articulable suspicion defendant was engaged in criminal activity permitting the motor vehicle stop, also provided probable cause to believe defendant had committed,

and was committing, a criminal offense permitting his arrest once the stop was effectuated.

As explained in the State's briefs, and the search warrant affidavit that accompanied its second brief, the investigation and surveillance of defendant with Encarnacion, about which the DCJ detectives were aware, supported a "well[-]grounded suspicion," Johnson, 171 N.J. at 214-15, defendant had committed, or was committing, a criminal offense by engaging in drug distribution activities with Encarnacion. The information learned directly by the detectives immediately following the motor vehicle stop—including the suspicious and inexplicable absence of the contents of what had been a filled and weighted duffel bag—only added to the totality of the circumstances known to the DCJ detectives that established probable cause to arrest prior to the stop. Thus, defendant's de facto arrest was supported by probable cause.

Defendant also claims the search warrant was improvidently granted because it was the product of the unlawful motor vehicle stop and de facto arrest. We reject defendant's argument because, for the reasons noted, we are not convinced that either the motor vehicle stop or the de facto arrest was improper. Defendant offers no other argument challenging the validity of the search warrant.

A-1070-19

Any of defendant's arguments we have not expressly addressed are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1070-19